AMERICAN PHYSICIANS INSURANCE
EXCHANGE and American Physicians
Service Group, Inc., Petitioners,

v.

Ramon A. GARCIA, M.D., Respondent.

No. D–1239.

Supreme Court of Texas.

March 9, 1994.

Rehearing Overruled June 8, 1994.

J. Sam Winters, Barry Bishop, Jay A. Thompson, Austin, Donald M. Hunt, Lubbock, George Spencer, San Antonio, for petitioners.

Charles Nicholson, San Antonio, David A. Slaughter, Ronald D. Krist, Houston, Pat Maloney, Sr., San Antonio, for respondent.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT and ENOCH, Justices, join.

We grant American Physicians Insurance Exchange's ("APIE's") motion for rehearing, withdraw our prior opinion and judgment, and substitute the following in its place.[1] We decide whether Dr. Ramon Garcia's malpractice insurance carrier, APIE, breached its duty to defend Garcia or its *Stowers* [2] duty to settle. We hold that the evidence conclusively establishes that APIE discharged its duty to defend Garcia, and that because APIE never received a settlement demand within its policy limits, it did not breach its *Stowers* duty to settle. We therefore reverse the judgment of the court of appeals and render judgment in favor of APIE.

## I

On March 8, 1984, Araminta Cardenas, individually and as Guardian of the Estate of Gustavo Cardenas, Norma Vasquez Cardenas and Carmen Cardenas ("the Cardenases") filed a medical malpractice lawsuit against Garcia and others. In their Original Petition, the Cardenases alleged that Garcia was guilty of malpractice in his treatment of Gustavo Cardenas from October 3, 1980, to approximately April 12, 1982. The malpractice claim arose out of Garcia's prescription of two drugs, Haldol and Navane, which allegedly caused Cardenas to develop tardive dyskinesia, a debilitating brain disease. The Cardenases initially alleged that "on or about April 12, 1982, Gustavo Cardenas was placed under the care of another physician." At all times alleged in the Original Petition, Garcia was insured against medical malpractice claims by three consecutive Insurance Corporation of America ("ICA") policies.

In 1980, Garcia was covered by an ICA "claims-made" [3] medical malpractice insurance policy with limits of $100,000. In 1981 and 1982, Garcia was covered under two consecutive one-year ICA "occurrence" policies, each providing him with $500,000 in coverage.[4] In 1983, Garcia purchased an APIE

---

1. Given our disposition of this case, we need not, and do not, decide whether the pretrial non-execution agreement between Garcia and the Cardenases negated all of Garcia's damages under the facts of this case.

2. The duty of an insurer to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits is generically referred to in Texas as the *Stowers* duty. *Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

3. Typically, a claims-made policy covers only claims made during the policy period for injuries

or occurrences within a coverage period extending back to a recited retroactive date. *See Hartford Fire Ins. Co. v. California*, — U.S. —, —, 113 S.Ct. 2891, 2896, 125 L.Ed.2d 612 (1993) (Insurance Antitrust Litigation). Because this claim was brought in 1983, a claims-made policy terminating in 1980 would not provide coverage.

4. In contrast to a claims-made policy, an occurrence policy provides "long-tail" coverage. *See Hartford*, — U.S. at —, 113 S.Ct. at 2896. In other words, if there is "physical injury or property damage during the policy period caused by an occurrence," *see infra* note 21, but no claim is

occurrence policy with a $500,000 limit per occurrence, the policy involved in this appeal.

On December 23, 1983, several months before they filed their Original Petition, the Cardenases sent Garcia a letter notifying him of their intention to file a lawsuit against him for negligent treatment of Cardenas from September 1980 "to the present time." Garcia reported this letter to APIE. On January 3, 1984, APIE "[n]otified Garcia of his limited coverage with API[E] for this incident." Garcia's records indicated that only one of Cardenases' office visits, on January 18, 1983, occurred during APIE's policy period. APIE therefore concluded in an internal memo that the "lion's share" of the Cardenases' claim arose out of treatment performed during ICA's earlier policy periods. Accordingly, APIE advised Garcia that coverage under its policy turned solely on the January 1983 office visit.

As a result of the Cardenases' letter, APIE wrote to ICA on March 20, 1984, and confirmed their "agree[ment] to share in any settlement or judgment on a pro-rata coverage basis." They also agreed to split evenly the legal fees incurred in Garcia's defense. ICA retained Ross Crossland and his law firm to assume primary responsibility for Garcia's defense. APIE hired another attorney to "simply monitor the developments in this lawsuit." APIE first received a copy of the Cardenases' March 8, 1984 Original Petition on March 23, 1984, three days after it arranged for Garcia's defense.

The Cardenases subsequently filed five amended petitions, none of which alleged malpractice during the APIE policy period. Eventually, on July 24, 1985, APIE notified Garcia that its policy was not applicable because "all allegations made against you occurred prior to your coverage with American Physicians."[5]

Questions concerning insurance coverage plagued settlement negotiations. On July 10, 1985, Crossland advised the Cardenases' lawyer, Pat Maloney: "[T]he companies have elected to pro rate any settlement or adverse judgment or jury verdict on an equal basis." Evidently, Crossland mistook the insurers' agreement to divide his legal fees equally as an indication that any settlement or judgment would be split on that basis rather than prorated in proportion to coverage. In this same letter, Crossland stated, "my understanding of this agreement ... is that the total insurance available is ... $600,000," the combined limits of the 1983 APIE policy and a $100,000 ICA claims-made policy for the year 1980.[6] After Crossland sought settlement authority from the insurers, he informed Maloney on July 26, 1985:

> Apparently confusion has arisen with regard to the extent of the liability insurance available....
>
> ....
>
> Although I have been advised by representatives of APIE that I do not in any manner represent their interests, based on information and belief ... Garcia was covered by an insurance policy with that company for $500,000.00.
>
> It is my understanding that these policies cannot be totaled or aggregated in any manner to establish coverage in an amount in excess of $500,000.[7]

The Cardenases' attorney made his first written settlement demand to Crossland on

---

made until after the policy period expires, the policy still provides coverage.

5. APIE continued to pay for one-half the costs of defending the suit until August 13, 1985, after the first judgment was signed on August 2, 1985, but before an amended, or "Modified Final Judgment," was signed on August 30, 1985.

6. Although Crossland was paid by ICA and APIE, he was Garcia's, not APIE's, attorney. *See* Tex.Disciplinary R.Prof.Conduct 1.06, 1.07, 1.08(f) (1989), *reprinted in* Tex.Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon Supp.1994) (State Bar Rules art. X., § 9); *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552, 558–59 (Tex.1973) (hold-

ing that an attorney retained by an insurer to defend the insured owes the insured a duty of unqualified loyalty).

7. APIE filed a malpractice crossclaim against Crossland and its other attorneys in the *Stowers* lawsuit seeking contribution and indemnity for any sums that APIE might be required to pay; but the jury charge did not include any questions regarding Crossland, and thus the judgment exonerated him of responsibility to APIE. *See also Garcia v. American Physicians Ins. Exch.*, 812 S.W.2d 25, 28 n. 4 (Tex.App.—San Antonio 1991) (same case).

July 15, 1985. In this letter, Maloney made a settlement demand of $600,000, and conditioned the demand on acceptance within ten days. Garcia's personal attorney, Clem Lyons, wrote to Crossland on July 22, urging ICA and APIE to accept Maloney's demand.

On July 26, 1985, however, after learning of an additional ICA policy with a $500,000 limit, Maloney raised his demand to $1.1 million. Crossland responded to this increased demand the same day by informing Maloney in the letter quoted above that Garcia's coverage was limited to $500,000. This letter also disclosed a second $500,000 ICA policy.

On the day of trial, July 29, 1985, Maloney raised his demand again, to $1.6 million, and imposed a deadline for acceptance of 10:00 a.m. the same day. Lyons also wrote to Crossland on the day of trial to urge acceptance of the $1.6 million settlement demand. ICA and APIE made no settlement offer at this time. The record does not indicate that the Cardenases ever communicated any settlement demand of less than $600,000, or that any demand was made that did not require the two insurers to accept jointly.

After APIE informed Garcia that there was no coverage under its policy, but before trial on July 29, 1985, the Cardenases, Garcia, and their attorneys entered into a non-execution agreement whereby the Cardenases agreed to look solely to ICA and APIE for satisfaction of any judgment that might be rendered against Garcia. The non-execution agreement also indemnified Garcia for any judgment that might be rendered in excess of the amounts actually collected from ICA and APIE. In return, Garcia assigned any claims he might have against APIE or ICA to the Cardenases.

On the day of trial, the Cardenases filed a Sixth Amended Original Petition that alleged for the first time that Garcia's malpractice continued into 1983, and thus into APIE's policy period. That petition alleged that even though Mrs. Cardenas advised Garcia that her husband had suffered adverse side effects from drugs Garcia prescribed "during the course of several office visits from September 1980 to February or March 1983," Garcia "continued to treat Gustavo Cardenas" with neuroleptic drugs, "until February or March 1983." Lyons testified at the subsequent *Stowers* trial that the Cardenases' attorney filed the Sixth Amended Original Petition at his urging because he believed it to be in Garcia's best interest for the pleadings to invoke the maximum possible insurance coverage for Garcia.

The malpractice case, *Cardenas v. Garcia*, was tried to the court. The court found that Garcia's course of treatment constituted continuing negligence beginning September 1980 and ending February 1983, and rendered judgment for $2,235,483.30 plus costs and interest. Under the terms of the Non–Execution Agreement, the $2,235,483.30 judgment against Garcia could not be executed against him personally. Thereafter, the Cardenases, solely in their capacity as Garcia's assignees, filed suit in Garcia's name against his liability insurers alleging that Garcia had suffered actual damages in the amount of the $2,235,483.30 judgment.

In this suit, the Cardenases alleged that the insurers violated their duty to defend Garcia and their *Stowers* duty to accept a reasonable settlement demand within policy limits. Subsequent to filing but before trial of this case, however, the Cardenases and the insurance companies entered into two settlement agreements. The first agreement, dated May 1, 1986, released ICA from all liability in both the malpractice lawsuit and the *Stowers* suit in exchange for $2,000,000.00. Under the second agreement, dated May 5, 1987, and entitled "Partial Settlement Agreement," APIE paid the Cardenases and their attorneys $500,000 for their agreement not to contest APIE's motion for a six-month continuance of the *Stowers* case, their agreement to offset the amount paid against any further judgment, and their release of liability for any judgment in excess of $2.5 million against APIE or American Physicians Service Group, Inc. ("APSG"), an affiliate of APIE. Thus, the Cardenases received $2.5 million for Garcia's claims before the *Stowers* suit even proceeded to trial.

The *Stowers* suit was tried to a jury beginning November 9, 1987. The jury found that (1) APIE negligently failed to settle Garcia's

case prior to entry of judgment on September 30, 1985, (2) the sixth amended petition alleged separate and distinct acts of negligence committed by Garcia during APIE's policy period, (3) APIE denied coverage to Garcia, (4) APIE failed to defend Garcia at the trial of the Cardenas case, and (5) APIE's and APSG's actions in failing to defend and provide coverage were false, misleading, or deceptive acts or practices in violation of TEX.INS.CODE ANN. art. 21.21, § 4 (Vernon Supp.1994) ("article 21.21"), and the Deceptive Trade Practices–Consumer Protection Act, TEX.BUS. & COM.CODE ANN. § 17.50 (Vernon 1987) ("DTPA").[8] The jury further found that each of these acts was negligent, involved heedless and reckless disregard for Garcia's rights, constituted an unfair practice in the insurance business, was unconscionable, was a proximate cause of Garcia's damages, and was done knowingly. The jury also found that ICA's failure to settle the Cardenas case prior to September 30, 1985, was negligent, in heedless and reckless disregard of Garcia's rights, and an unfair practice in the business of insurance. The jury concluded that ICA's acts and omissions were knowingly done, were unconscionable, and were the proximate cause of damage to Garcia.

The jury further found that APIE's acts and omissions caused 16 percent, and ICA's 84 percent, of the damages awarded in *Cardenas v. Garcia.* Damages against APIE were assessed at $2,235,000.00 in compensatory damages (the amount of the judgment in the malpractice suit), $250,000.00 in exemplary damages, and $250,000.00 "additional" damages under the DTPA. The court also awarded attorneys' fees totalling $820,500.00.

Because of ICA's settlement, the court rendered judgment only against APIE and APSG. The Cardenases elected to have judgment rendered solely on the jury findings that APIE and APSG had violated the Insurance Code. The trial court rendered judgment against APIE and APSG jointly and severally in the amount of $1,331,574.00,

consisting of APIE's proportional share of liability as determined by the jury, doubled pursuant to article 21.21, section 16 of the Insurance Code, and attorneys' fees.

The court of appeals recalculated the Cardenases' damages at $3,167,274.09. Under the assumption that Garcia's policy limits were $1.6 million, this figure represented the amount of the judgment in excess of policy limits in the malpractice suit, plus interest, plus two times actual damages pursuant to article 21.21 of the Insurance Code, plus attorneys' fees. 812 S.W.2d at 30. Because APIE's partial settlement with the Cardenases established a liability cap of $2,500,000 and required a credit of $500,000, and because ICA's settlement shielded ICA from liability, the court of appeals rendered judgment against APIE for $2,000,000.

## II

■ In the insuring clause of the professional liability policy it issued to Garcia, APIE contracted to perform two related obligations: (1) to defend any claim against Garcia within the scope of coverage, even if "any of the allegations ... are groundless, false, or fraudulent," and (2) to indemnify Garcia for any damages awarded against him within the scope of coverage up to the policy limits. APIE POLICY § I. These contractual obligations, along with language in the insuring clause granting control over the insured's defense to an insurer, *see, e.g., id.* ("The Exchange shall have the right and duty to defend any suit against the insured seeking such damages"), give rise to a third, generally recognized, implied duty of liability insurers—the duty to accept reasonable settlement demands within policy limits. *Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 547–48 (Tex.Comm'n App.1929, holding approved); *see also* Kent D. Syverud, *The Duty to Settle,* 76 VA.L.REV. 1113, 1117–26 (1990); ROBERT H. JERRY, II, UNDERSTANDING INSURANCE LAW 586 (1987) ("all courts" recognize duty to settle); Kelly H.

---

8. The Texas Insurance Code, art. 21.21, § 4 is a laundry list of deceptive insurance practices, none of which involves the duty to settle under a liability insurance policy. *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145 (Tex.1994). Likewise,

the Deceptive Trade Practices–Consumer Protection Act incorporates Texas Insurance Code art. 21.21, *see* TEX.BUS. & COM CODE ANN. § 17.50(a)(4) (Vernon 1987), but does not address third-party settlement practices. *Id.*

Thompson, Comment, *Bad Faith, Limiting Insurers' Extracontractual Liability in Texas*, 41 SW.L.J. 719, 722 (1987); Robert E. Keeton, *Liability Insurance and Responsibility for Settlement*, 67 HARV.L.REV. 1136, 1137–48 (1954).

■ Although Garcia argues that this case is not solely a *Stowers* lawsuit because remedies under the Deceptive Trade Practices Act and TEX.INS.CODE. art. 21.21 are cumulative of other remedies, and the judgment below is couched in terms of a violation of article 21.21, all of the jury issues that form the basis for the judgment against APIE in the *Stowers* case involve the breach of either the duty to defend or the duty to settle the malpractice lawsuit.[9] Breach of the *Stowers* duty does not constitute a violation of article 21.21 or the DTPA.[10] Moreover, APIE is not responsible for any separate DTPA or Insurance Code violation because the record in this case is devoid of evidence that APIE ever engaged in any unfair or deceptive act or practice as defined in the relevant statutes.[11] *See* TEX.INS.CODE ANN. art. 21.21, §§ 4, 16(a) (Vernon Supp. 1994). We hold that there was no violation of article 21.21.

## A

■ APIE's duty to defend Garcia is determined solely by the allegations in the

9. Issue 4 asked, "Was such failure to attempt to settle an unfair practice in the business of insurance?" Similarly, Issue 13 asked, "Was such failure to provide coverage, if any, an unfair practice in the business of insurance?" Issue 24 asked, "Was such failure, if any, to defend Garcia an unfair practice in the business of insurance?" Every other breach issue presented to the jury was premised on the breach of one of these duties.

10. Garcia contends that *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex.1988), and *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.), support his contention that jury findings to the effect that a failure to settle involves an unfair or deceptive practice should entitle him to recover under article 21.21. *Vail*, however, involved an insurer's bad faith refusal to pay a claim under a first-party property insurance policy. *Vail*, 754 S.W.2d at 130. A *Stowers* action, by definition, involves an insurer's duty to settle a covered lawsuit—a situation that can only arise under a third-party liability insurance policy. Thus *Vail* is inapposite.

Garcia's reliance on *Allstate Ins. Co. v. Kelly* is also misplaced. In *Kelly*, Allstate "generously conced[ed] in its Application that, as an insurer, it may be, subject to the application of the Texas Deceptive Trade Practices Act ... and the [Texas Insurance Code]." Respondents' Answer to Petitioners' Application for Writ of Error at 26, *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595 (Tex. App.—Tyler 1984), *writ ref'd n.r.e.*, 28 Tex.Sup. Ct.J. 496 (June 19, 1985) (No. C–3731); *see also* Application for Writ of Error at 3–6, 39–62; Amicus Curiae Brief of Texas Association of Defense Counsel at 3 ("[N]either the petitioners nor the respondents adequately consider or address this important question."). Consequently, the "writ refused, no reversible error" designation in *Kelly* does not represent approval of *Stowers* actions brought under the Texas Deceptive Trade Practices–Consumer Protection Act and the Texas Insurance Code.

11. *Kelly* does not support the proposition that a breach of the *Stowers* duty is an unfair or deceptive practice in the business of insurance. In *Kelly*, Allstate may have violated *both Stowers* and the DTPA. Allstate breached its *Stowers* duty by refusing to accept a reasonable demand. *Kelly*, 680 S.W.2d at 598, 607. Allstate potentially violated the DTPA by its other actions. Significantly, after Allstate refused to settle, it sought to pay its policy limits into the court registry and leave its insured exposed in the event of an excess judgment. *Id.* at 598. Allstate also encouraged its insured not to hire counsel, and neglected to inform its insured of the settlement demand or its reasons for rejecting the demand until over two months after the demand had expired. *Id.* at 600, 608–09. Whether any of these activities constitute unfair or deceptive practices in the business of insurance is determined under the applicable statutes and Insurance Board Orders. *See generally Allstate Ins. Co. v. Watson*, 876 S.W.2d 145 (Tex.1994); TEX. INS.CODE ANN. art. 21.21 (Vernon 1981 & Supp. 1994); TEX.BUS. & COM.CODE ANN. § 17.50(a)(4) (Vernon 1987). Texas Insurance Code article 21.21–2 also regulates claim settlement practices, but is subject to enforcement only by the State Board of Insurance. TEX.INS.CODE ANN. art. 21.-21–2, § 6 (Vernon 1981 & Supp.1994); *Watson*, 876 S.W.2d at 148 & n. 6. We express no opinion concerning the difference between the requirement of "good faith" in "attempting" settlement under TEX.INS.CODE ANN. art. 21.21–2, § 2(b)(4), and the common law standard of ordinary care concerning a third-party liability insurer's attempts to settle a covered lawsuit. *Compare Stowers*, 15 S.W.2d at 547 *and Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex.1987) (third-party ordinary care standard) *with Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987) *and Aranda v. Insurance Co. of N.Am.*, 748 S.W.2d 210, 213 (Tex.1988) (first-party "bad faith" standard).

pleadings filed against him. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973); *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24 (Tex.1965). If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured. *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex.1982).

■ The first time any pleading was filed against Garcia alleging malpractice during APIE's policy period was the day of trial, July 29, 1985, when the Cardenases filed their Sixth Amended Original Petition. Although APIE agreed with ICA to share in the defense costs, their agreement—about which Garcia was fully informed and to which he did not object—assigned control over the defense solely to ICA. Garcia's policy links the duty to defend with the corresponding right to control the defense, and consequently APIE could only have assumed a voluntary duty to defend by asserting this right. Therefore, only ICA was under a legal obligation to defend Garcia until July 29, 1985. The Cardenases do not urge any equitable basis here, nor did they in the courts below, upon which APIE should be barred from relying on traditional legal principles regarding its duty to defend Garcia.[12] Thus we conclude that APIE's duty to defend arose only upon the filing of the sixth amended petition.

Every witness who testified at the *Stowers* trial, including the Cardenases' attorney and Garcia's personal attorney, testified that Ross Crossland vigorously represented Garcia during the malpractice trial. It is true that the evidence was disputed as to whether APIE entered or "reentered" the case once the sixth amended petition was filed and its coverage was invoked under well-established legal principles. But Crossland, who was retained by the insurers jointly to defend Garcia, at no time abandoned Garcia's defense. The testimony is also undisputed that APIE paid its share of Garcia's defense, in-

cluding the five days, from July 24 to July 29, during which APIE took the position that there was no coverage under its policy. We therefore hold that the evidence conclusively establishes that APIE discharged its duty to defend Garcia, and the jury's answers to the contrary have no evidentiary support.

### B

■ The remaining question is whether the judgment of the court of appeals can be affirmed on the basis that APIE breached its duty to settle the malpractice case. We start with the proposition that an insurer has no duty to settle a claim that is not covered under its policy. *See generally Western Heritage Ins. Co. v. River Entertainment*, 998 F.2d 311, 312 (5th Cir.1993) (holding that if no duty to defend is invoked by the pleadings, "the possibility of future indemnity under the terms of the policy is foreclosed"); C.T. Drechsler, Annotation, *Allegations in Third Person's Action Against Insured as Determining Liability Insurer's Duty to Defend*, 50 A.L.R.2d 458, 472–73 (1956). Thus, APIE had no duty to settle before the sixth amended petition was on file, containing allegations that brought the Cardenases' claim within the scope of Garcia's coverage.

■ Once the sixth amended petition was filed, APIE was required to exercise "that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business" in responding to settlement demands within policy limits. *Stowers*, 15 S.W.2d at 547; *see also American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 485–86 (Tex.1992) (Hecht, J., concurring, joined by Phillips, C.J., Gonzalez, Cook, and Cornyn, JJ.); *Ranger County Mut. Ins. Co.*, 723 S.W.2d at 659 (Tex.1987); *Foremost County Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 757 (5th Cir.1990). Generally, a *Stowers* settlement demand must propose to release the insured fully in exchange for a stated sum of money, but may substitute "the policy limits"

---

**12.** Although Garcia initially pled an estoppel theory against APIE, he waived this theory by not requesting that this issue be included in the jury charge. Nor is this issue conclusively established against APIE because, as this record re-

flects, APIE notified Garcia on January 3, 1984, that his coverage under the APIE policy was limited because only one office visit occurred during the APIE policy period.

for a sum certain. The *Stowers* duty is not activated by a settlement demand unless three prerequisites are met: (1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment. *See* Keeton, *supra* at 1143–48 (discussing applicable standard of care). A demand above policy limits, even though reasonable, does not trigger the *Stowers* duty to settle.[13] *Stowers*, 15 S.W.2d at 547; *American Centennial*, 843 S.W.2d at 482 (plurality opinion).

In *Ranger*, we stated that insurers have a duty of ordinary care that includes "investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle." 723 S.W.2d at 659; *see also American Centennial*, 843 S.W.2d at 482, 485 (plurality and concurring opinions) (citing *Ranger* for standard of reasonableness in "investigating, preparing to defend, trying or settling the third party action"). At the same time, however, the court noted that "there is no contention that Ranger was negligent in investigation or trial of the Fitch/Eagle lawsuit." 723 S.W.2d at 659. In support of the judgment against the insurer, the court cited evidence that the insurer failed to accept a settlement demand of $19,500 in personal injury damages and $19,500 in property damages, or "[i]f limits are otherwise ... to settle within such limits less $500.00." *Ranger*, 723 S.W.2d at 659–660. The evidence also indicated that the insurer had linked together the settlements of multiple insureds even though the demand was severable, and that the insurer failed to inform its insureds of the terms of the demand. We held this was legally sufficient evidence to

support the judgment against the insurer. *Id.* at 660.

█ We recognize that settlement negotiations are adversarial and that reasonable negotiation often involves hard bargaining by both sides. In describing the *Stowers* duty as a duty to make "reasonable attempts to settle," *Ranger* does not alter an insurer's duty to accept reasonable demands within policy limits. Nor does *Ranger* impose any duty on an insurer to accept a settlement demand in excess of policy limits or to make or solicit settlement proposals.[14] In the context of a *Stowers* lawsuit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it. Although the dissent relies on language in *Ranger* that is dictum, given that the only negligence claim presented in *Ranger* was a *Stowers* claim, *see Ranger*, 723 S.W.2d at 659, we have no quarrel with the notion that a formal demand is not "an absolute prerequisite," 876 S.W.2d at 863, for holding an insurer liable for damages caused by its misconduct other than a *Stowers* breach. However, the *Stowers* remedy of shifting the risk of an excess judgment onto the insurer is inappropriate absent proof that the insurer was presented with a reasonable opportunity to prevent the excess judgment by settling within the applicable policy limits.

Here, APIE had an opportunity to settle within the limit of Garcia's coverage only if it was mistaken in its contention that the multiple policies could not be stacked. In response to a $1.1 million demand, Crossland advised the Cardenases' attorney, Maloney, on July 26, 1985, "these [ICA and APIE] policies cannot be totaled or aggregated in any manner to establish coverage in an

---

**13.** A liability policy requires an insurance company to indemnify an insured only up to the insured's contractual limits with that company. Thus, insurers have no duty to accept over-the-limit demands. We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would

remain within the policy limits. *See* Keeton, *supra* at 1148–50. Nor do we address the *Stowers* duty when a settlement requires funding from multiple insurers and no single insurer can fund the settlement within the limits that apply under its particular policy.

**14.** *See infra* notes 17 & 18 and accompanying text.

amount in excess of $500,000." Thus, Maloney was informed of the insurers' position concerning the policy limits, and was advised of the demand he would have to make to trigger the *Stowers* duty. Maloney elected to proceed on the disputed assumption that he could aggregate the policies. Conversely, APIE elected to bear the risk that its point of view might have been incorrect, which could result in liability for any excess judgment. Because Maloney raised his demand to $1.6 million, APIE had no opportunity to settle within its stated policy limits.

The dissent contends that APIE breached its *Stowers* duty despite never receiving a $500,000 demand, while relying on *Ranger*, a decision predicated on a demand *within* the applicable policy limits. Although the dissent's interpretation of *Ranger*, "a formal settlement demand ... is no longer *an absolute* prerequisite," 876 S.W.2d at 863 (emphasis added), appears innocuous enough, the dissent's application of *Ranger* to the facts is problematic. The dissenting justices assiduously maintain that they do not mean to argue that the burden of making settlement offers should be shifted to the insurer. Only one jurisdiction apparently supports a rule that would impose such a general duty.[15] *See Rova Farms Resort v. Investors Ins. Co.*

*of Am.*, 124 N.J.Super. 248, 306 A.2d 77 (Ct.App.Div.1973) (per curiam), *aff'd in part*, 65 N.J. 474, 323 A.2d 495 (1974). In light of the fact that Maloney was informed of the insurers' position concerning the policy limits, it is unclear how the additional duty the dissent would impose differs from the lower court's rule in *Rova Farms*. The dissent proposes no concrete step short of tendering the policy limits that an insurer could take, in any case in which the potential for an excess judgment exists, to preclude a *Stowers* lawsuit. Because the "reasonableness" of any action other than offering the policy limits would remain indeterminate until the conclusion of the second trial, and both parties to any negotiation would take this fact into account, the dissent's approach would be indistinguishable from a rule that expressly shifted this burden. The principal commentators in this area have identified few cases that even consider the possibility of a breach of the duty to settle absent a demand within policy limits.[16] *See* 14 GEORGE J. COUCH & RONALD ANDERSON, CYCLOPEDIA OF INSURANCE LAW § 51:17 (2d ed. 1982 & Supp.1993); 7C JOHN ALLEN APPLEMAN & WALTER F. BERDAL, INSURANCE LAW AND PRACTICE § 4711 (rev. ed. 1979 & Supp.1993); W.E. Shipley, Annotation, *Duty of Liability Insurer to Settle or Compromise*, 40 A.L.R.2d 168 (1955).[17]

---

**15.** The intermediate appellate opinion in *Rova Farms Resort v. Investors Ins. Co. of Am.*, 124 N.J.Super. 248, 306 A.2d 77 (Ct.App.Div.1973) is the only case we have identified that has predicated an insurer's liability for an excess judgment on the breach of a general duty to make settlement offers to the claimant. It is unclear from the opinion of the New Jersey Supreme Court whether the New Jersey duty is truly this extensive. In *Rova Farms*, the insured-operator of a resort property was sued for injuries sustained by a guest during a diving accident that rendered him "almost a total quadriplegic." 323 A.2d at 498 n. 1. Despite the urging of the insured's attorney that the insurer offer its policy limits of $50,000, it offered only $12,500. *Id.* Among its other concerns, the court was troubled for obvious reasons by the insurer's solicitation of a contribution to the settlement from its insured without committing its own policy limits. *Id.* 323 A.2d at 502 & n. 3; *see also* W.E. Shipley, Annotation, *Duty of Liability Insurer to Settle or Compromise*, 40 A.L.R.2d 168, 205–08 (1965). Under such circumstances, the New Jersey Supreme Court held that a settlement demand by the plaintiff is not an absolute "prerequisite for finding the insurer to have acted other than in good faith." *Id.* 323 A.2d at 505.

**16.** Although two cases are mentioned in COUCH, CYCLOPEDIA OF INSURANCE LAW § 51.17 (Supp.1993), that superficially appear to support the rule the dissent proposes, on closer analysis neither case turns on that proposition. In *Thomas v. Lumbermens Mut. Casualty Co.*, 424 So.2d 36, 39 (Fla. App.1982), the appellate court affirmed a judgment based on a jury verdict for the insurer, but in dictum suggested that an insurer may be liable for failure to make an offer. In *Smith v. Blackwell*, 14 Kan.App.2d 158, 791 P.2d 1343, 1347 (1989), the court held that an insurer's offer of its policy limits shortly after the commencement of the underlying lawsuit would not "cure" its failure to accept an unconditional within-limits demand the claimant made prior to the commencement of the lawsuit. Neither case imposes on insurers an affirmative duty to make settlement offers, or risk a judgment in excess of policy limits.

**17.** A few courts have held insurers liable for a breach of the duty to settle in the absence of a within-limits demand. However, these cases generally involve affirmative misconduct by the insurer to subvert or terminate settlement negotiations. *See* Syverud, *supra* at 1166–68 & nn.

From the standpoint of judicial economy, we question the wisdom of a rule that would require the insurer to bid against itself in the absence of a commitment by the claimant that the case can be settled within policy

134–139; JERRY, *supra* at 592–93. For the reasons below, *see infra* note 18, we disagree with any reading of the no-demand cases that would require insurers rather than claimants to make settlement offers. *See Rova Farms*, 323 A.2d at 505; *Powell v. Prudential Property & Casualty Co.*, 584 So.2d 12, 14 (Fla.Dist.Ct.App.1991) (citing *Rova Farms* ); *Spray v. Continental Casualty Co.*, 86 Or.App. 156, 739 P.2d 40, 44 (1987); *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 586 F.Supp. 84, 87 (E.D.Pa.1984) (citing *Rova Farms* ); *Shearer v. Reed*, 286 Pa.Super. 188, 428 A.2d 635, 636–38 (1981) (citing *Rova Farms* ); *Alt v. American Family Mut. Ins. Co.*, 71 Wis.2d 340, 237 N.W.2d 706, 709–10, 712–13 (1976) (citing *Rova Farms* ) (claimant made several demands); *Coleman v. Holecek*, 542 F.2d 532, 536 n. 6 (10th Cir.1976) (citing *Rova Farms* ) (duty to defend case); *Fulton v. Woodford*, 26 Ariz.App. 17, 545 P.2d 979, 983–84 (1976) (criticizing *Rova Farms* but nevertheless imposing a duty to offer policy limits when "there is a high potential of claimant recovery and a high potential of [excess] damages"); *State Auto. Ins. Co. v. Rowland*, 221 Tenn. 421, 427 S.W.2d 30, 33–35 (1968). Both *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 515 (9th Cir.1984), and *Eastham v. Oregon Auto. Ins. Co.*, 273 Or. 600, 540 P.2d 364, 368 (1975), held for the insurer rather than the insured.

Many of the cases above, and every other case the dissent cites, involve either affirmative misconduct in settlement negotiations, or an insurer that rejected an opportunity to settle within the policy limits. The reasoning in many of the cases above is actually consistent with our holding that an insurer cannot breach a duty by not tendering a settlement offer. *See also Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161, 165–66 (Mich.1986) (citing *Rova Farms* for the proposition that an insurer's "failure to solicit [demands] or initiate settlement negotiations when warranted under the circumstances" is a factor to consider in determining whether the insurer acted in bad faith); *American Centennial*, 843 S.W.2d at 482 (plurality opinion).

We think it would be particularly inappropriate to impose liability on APIE retroactively for failure to observe a new pretrial formality. The Cardenas trial predated *Ranger* by six months, so APIE could not have had notice of the "attempts to settle" dictum the dissent relies upon. *Ranger*, 723 S.W.2d at 659. Moreover, to the extent *Stowers* and *Ranger* formalize the negotiation process, we think claimants are perfectly capable of transmitting suitable settlement demands without assistance from the other side. Finally, we reject the *Fulton v. Woodford* formulation because settlement is particularly unlikely when

limits. Considering the negotiating incentives for each party, we conclude that the public interest favoring early dispute resolution supports our decision not to shift the burden of making settlement offers under *Stowers* onto insurers.[18] *See* Keeton, *supra*

substantial excess damages are virtually certain. By requiring insurers to observe an ineffective ritual on pain of waiving all policy limits, *Fulton* represents a trap for the unwary.

18. Requiring the claimant to make settlement demands tends to encourage earlier settlements. Unlike the insurer, the claimant owes the insured no *Stowers* duty and cannot face any additional risk or become a defendant in a second lawsuit for refusal to settle, no matter how unreasonable. However, the claimant stands to benefit substantially and increase the assets available to satisfy any judgment by committing to settle for a reasonable amount within policy limits if the insurer rejects the demand. If the claimant makes such a settlement demand early in the negotiations, the insurer must either accept the demand or assume the risk that it will not be able to do so later. In cases presenting a real potential for an excess judgment, insurers have a strong incentive to accept. Early acceptance not only settles the liability case but obviates the possibility of subsequent *Stowers* litigation altogether.

Conversely, if the burden of proposing settlement within policy limits is on the insurer, then the incentives shift in favor of delayed settlement. First, if the insurer offers less than the policy limits, the claimant can reasonably anticipate that the offer will increase as trial approaches, so long as the case presents a genuine risk of an excess judgment. For the insurer to stand on a below-limits offer under such circumstances is to risk excess liability for its recalcitrance. Therefore, a claimant will have an incentive to "play chicken" with the insurer in anticipation that the final offer on the eve of trial will equal either the policy limits or the insurer's reservation price—the most the insurer thinks the case could reasonably be worth for settlement purposes.

Second, if the insurer tenders the policy limits earlier than the trial date, the claimant will not necessarily accept the offer. One reason is because the insurer has now established a "floor" for negotiations and must stand by its offer or later risk excess liability for unreasonably withdrawing its offer. Because the claimant bears little risk of losing the opportunity to settle for the policy limits, the claimant has no incentive to settle until he or she determines whether the defendant's assets other than liability insurance would make an excess judgment worth collecting. This is further complicated by the fact that evidence of the assets available to satisfy the judgment is not relevant before liability is established, *Wilmoth v. Limestone Prods. Co.*, 255 S.W.2d 532, 534 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.), and except for liability insurance, remains undiscoverable until after the liability case is finally resolved. *See* TEX.R.CIV.P. 166b(2)(a), (f).

at 1137–53, 1162–73; Syverud, *supra* at 1149–53, 1160–72. *See generally* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 554–60 (4th ed. 1992). The remaining issues, then, are whether APIE or Maloney correctly identified the amount of insurance coverage available, and if Maloney was correct, whether APIE's position was reasonable under the circumstances. In light of the verdict, however, we consider only the stacking issue. If APIE correctly asserted its right to reject even reasonable demands in excess of policy limits, then it cannot be liable.

### III

The following table illustrates the relationship of Maloney's settlement demands to the limits of the available insurance policies:

Garcia Insurance Coverage 1980 - 1983

and Settlement Demands

| | |
|---|---|
| 1,600,000 | July 29 demand |
| 600,000 | lowest demand |
| 500,000 | limit |
| | 1981 ICA 500,000 |
| | 1982 ICA 500,000 |
| | 1983 APIE 500,000 |
| 100,000 | |
| | 1980 ICA 100,000 |
| 0 | |

Despite APIE's insistence that coverage was limited to $500,000, the Cardenases never made any settlement demand less than $600,000.[19] Even if this demand were reasonable, it triggered no *Stowers* duty unless it was within the applicable policy limits. The Cardenases' demands could satisfy this "policy limits" requirement only if two things were true: (1) Garcia's continuing malpractice triggered coverage under multiple policies,[20] and (2) the limits of each triggered policy could be "stacked" to provide an aggregate limit.

**19.** Because the Cardenases' claim technically was not covered under the APIE policy until the day of trial, only the $1.6 million settlement demand could have potentially triggered a *Stowers* duty.

**20.** This case does not require us to decide which policies were triggered. Nor have the parties asked us to identify the appropriate test to determine which of several policies are triggered by a single "continuing" occurrence. We note in passing, however, that courts across the nation considering the coverage trigger issue for continuing occurrences have disagreed considerably in recent years. *See, e.g., Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 523 F.Supp. 110, 118 (D.Mass.1981) (applying "pure" or "strict manifestation" rule which triggers coverage upon actual discovery of injury), *aff'd as modified*, 682 F.2d 12, 24 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); *Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 24 (1st Cir.1982) (applying relaxed "manifestation rule" which triggers coverage in first policy period during which discovery of injury is possible), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1223 (6th Cir.1980) (applying "exposure" rule which triggers coverage in any policy period in which exposure to cause of injury occurred), *aff'd on reh'g*, 657 F.2d 814 (6th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.) (following "exposure" rule), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *American Home Prods. Co. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485, 1497 (S.D.N.Y.1983) (applying "injury-in-fact" rule which sets trigger in personal injury cases at point when body's defenses are "overwhelmed"), *aff'd with modifications*, 748 F.2d 760 (2d Cir.1984); *Keene Corp. v. Insurance Co. of N.Am.*, 667 F.2d 1034 (D.C.Cir. 1981) (applying "multiple" or "triple-trigger" approach which requires coverage under all policies during period of continuing exposure and manifestation), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Texas has limited precedent on this issue. *See Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737

To decide this case we need not determine how many policies provided Garcia indemnity coverage. The consecutive policies, covering distinct policy periods, could not be "stacked" to multiply coverage for a single claim involving indivisible injury. Even assuming that Garcia was covered under *all three* "occurrence" policies, APIE's *Stowers* duty to settle was never triggered.

■ Simply because a "Claim Occurrence"[21] extends throughout several policy

S.W.2d 380, 383 (Tex.App.—Dallas 1987, no writ) (explaining "pure manifestation" theory). We believe it would be unwise to select among these tests, or formulate our own, when the outcome of this case does not require resolution of this issue. Therefore, for present purposes, we assume without deciding that all three occurrence policies—the 1981 ICA policy, the 1982 ICA policy, and the 1983 APIE policy—provided coverage for Garcia.

**21.** "Each Claim Occurrence," a term of art defined in the APIE policy, appears to be an adaptation of "occurrence," a term of art from standard-form commercial liability policies, to the unique characteristics of medical malpractice risks and to other language in the APIE policy. "Occurrence" is typically defined in the following manner:

> An accident, including continuous or repeated exposure to substantially the same general conditions, which results in bodily injury or property damage that is neither expected nor intended from the standpoint of the insured. Continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*See, e.g., Michigan Chem. Corp. v. American Home Assurance Co.*, 728 F.2d 374, 378 (6th Cir.1984); *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1053–55 (D.C.Cir.1981) (Appendix A); *Insurance Co. of N. Am. v. Forty–Eight Insulations*, 633 F.2d 1212, 1227–28 (6th Cir. 1980) (Appendix B).

In contrast, "Each Claim Occurrence" means "each act or occurrence or series of acts or occurrences arising out of one event." APIE POLICY § II.C. The APIE policy language that defines the scope of "Each Claim Occurrence" to include "[a] series of acts or occurrences," is apparently intended to have a coverage effect similar to the "continuous or repeated exposure" unifying directive in commercial liability policies—but in a manner that is meaningful in the medical context. For example, medical malpractice frequently involves an operation or an extended course of treatment. A malpractice event may involve numerous independent grounds of negligence that cannot be unified as "repeated

periods does not raise the per-occurrence indemnity cap established in every policy.[22] Even the jurisdiction embracing the broadest coverage trigger rule has held that multiple coverage does not permit an insured to "stack" the limits of multiple policies that do not overlap:

> Not surprisingly, the policies do not explicitly provide a means of applying the
>> limits of liability to injuries that are covered by multiple policies. Keene claims that it is entitled to full indemnity for each injury up to the sum of the limits provided by the applicable policies. We do not agree. The principle of indemnity implicit in the policies requires that successive policies cover single [continuing] injuries. *That principle, however, does not require that Keene be entitled to "stack" applicable policies' limits of liability.* To the extent possible, we have tried to construe the policies in such a way that the insurers' contractual obligations [for continuing injuries or occurrences] are the same as their obligations for other injuries. Keene is entitled to nothing more. *Therefore, we hold that only one policy's limits can apply to each injury.* Keene may select the policy under which it is to be indemnified. *Cf.* [*Insurance Co. of N. Am. v. Forty-Eight Insulations* ], 633 F.2d at 1226 n. 28.

*Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1049–50 (D.C.Cir.1981) (emphasis added), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *see also Insurance Co. of N. Am. v. Forty–Eight Insula-*

*tions,* 451 F.Supp. 1230, 1243 (E.D.Mich. 1978), *aff'd,* 633 F.2d 1212, 1226 n. 28 (6th Cir.1980), *aff'd on reh'g,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.,* 707 F.Supp. 762, 774 (E.D.Pa.1989); *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1391–94 (E.D.N.Y.1988); *Owens–Illinois, Inc. v. Aetna Casualty & Sur. Co.,* 597 F.Supp. 1515, 1524 (D.D.C.1984); *Chicago Ins. Co. v. Pacific Indem. Co.,* 566 F.Supp. 954, 956 (E.D.Pa.1982) ("Plaintiff's contention that the coverages under Pacific's successive annual policies should be 'stacked' before [the] excess policy is called into play must be rejected.... The fact that the physician's alleged failure to make a proper diagnosis may have extended over several years does not mean that the failure gave rise to more than one claim of malpractice."); *Continental Casualty Co. v. Medical Protective Co.,* 859 S.W.2d 789, 792–93 (Mo.App.1993) (citing *Zipkin v. Freeman,* 436 S.W.2d 753, 763–64 (Mo.1968) (en banc)).

The *Stowers* claim by Garcia and the Cardenases rests on the assumption that Garcia had three times more insurance than he purchased. At no time during the four relevant coverage years did any two policies overlap. Thus, at no time during the four years did Garcia carry liability insurance with a per-occurrence limit greater than $500,000. Garcia did not purchase malpractice insurance for $1.5 million in coverage, as he might have done by purchasing excess or umbrella coverage,[23] and therefore he may

---

exposure to substantially the same conditions," but that nevertheless constitute "a series of acts or occurrences" that are related and form a single malpractice claim.

**22.** Policy language such as "occurrence" or "Per Claim Occurrence" generally measures policy deductibles or self-insured retentions as well as policy limits. *See, e.g., Owens–Illinois v. Aetna Casualty & Sur. Co.,* 597 F.Supp. 1515, 1525 (D.D.C.1984) ("If each claimant's exposure to the product must be regarded as a separate occurrence ... O–I must absorb a deductible on each asbestos claimant's lawsuit.... This 'multiple occurrence' interpretation would effectively deny O–I coverage because the deductibles are larger than the amount of any single claim successfully brought ... to date."). *See generally American Home Assurance Co. v. Hermann's Warehouse Corp.,* 215 N.J.Super. 260, 521 A.2d 903 (Ct.App.

Div.1987) (discussing insurer's settlement within limit of insured's deductible); *Casualty Ins. Co. v. Town & Country Pre–School Nursery, Inc.,* 147 Ill.App.3d 567, 101 Ill.Dec. 669, 498 N.E.2d 1177 (1986) (same).

**23.** *See, e.g., Chicago Ins. Co. v. Pacific Indem. Co.,* 566 F.Supp. 954 (E.D.Pa.1982) (discussing excess coverage in a dispute between primary and excess malpractice insurers); *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.,* 126 Cal.App.3d 593, 178 Cal.Rptr. 908 (1981) (discussing excess coverage when insured had four layers of excess coverage above two primary policies); *see also American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 485–86 (Tex. 1992) (Hecht, J., concurring, joined by Phillips, C.J., Gonzalez, Cook, and Cornyn, JJ.) (discussing primary insurer's duty to settle when insured

not claim to benefit from $1.5 million in coverage by stacking temporally distinct policies.

Although the triggering of multiple policies would provide multiple funding sources and thereby have a considerable effect on any contribution claims between ICA and APIE, it cannot lead to the conclusion that Garcia's total coverage for a "continuing" Claim Occurrence somehow exceeds the "Per Claim Occurrence" limit stated in every policy he purchased.

■ If a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies [24] that would maximize coverage. Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.

■ In this case, Garcia had a policy limit of $500,000 no matter which policy he might have selected. APIE never had an opportunity to settle for $500,000. Therefore, it cannot be held liable for not settling. The judgment of the court of appeals is reversed and judgment here rendered that respondent takes nothing.[25]

HIGHTOWER, Justice, joined by DOGGETT, GAMMAGE and SPECTOR, Justices, dissenting.

On December 31, 1992, this court issued an opinion in this cause which held that an injured plaintiff, as the assignee of the insured, is not precluded from recovering damages from the insurer by the existence of a covenant between the plaintiff and the insured to seek relief only from the insurer. Now the court has turned to several different issues for its decision—American Physicians Insurance Exchange's (APIE) duty to defend and to settle—and has avoided an issue important to the jurisprudence of the state. The court now holds that APIE discharged its duty to defend Dr. Ramon Garcia at the trial of the malpractice case and that since APIE never received a settlement demand within policy limits from the parties suing Dr. Garcia for malpractice, APIE could not have breached its Stowers duty to settle. I agree that APIE discharged its duty to defend Dr. Garcia in the malpractice trial until August 13, 1985, after the first judgment was signed on August 2, 1985. However, I disagree (1) with the court's characterization of the case as solely a Stowers case, (2) with the court's apparent conclusion that APIE did not breach its duty to make reasonable attempts to settle because it never received a settlement demand within its policy limits, (3) with the court's failure to even acknowledge APIE's reprehensible handling of Dr. Garcia's coverage under his APIE policy and (4) with the court's decision to ignore the questions concerning covenants not to execute.

I.

This dispute originated in a medical malpractice suit brought by Araminta Cardenas, individually and as guardian of the estate of Gustavo Cardenas (Cardenas), against Dr. Garcia. Dr. Garcia had treated Gustavo Cardenas over a period of several years,

has purchased temporally concurrent excess coverage); Syverud, *supra* at 1193–1207 (analyzing duty to settle in context of reinsurance and excess insurance).

24. As we observed at note 23, multiple policies may provide an aggregate limit under certain circumstances, such as if the insured purchased concurrent excess liability insurance.

25. We express no opinion on the other grounds upon which the court of appeals affirmed, as reformed, the trial court's judgment. Our silence concerning any of the issues addressed in our prior opinion or the dissent should not be understood as agreement with the resolution of any issue or the reasoning in those opinions. Although we have discussed the process of allocating indemnity or settlement costs among multiple insurers, this opinion does not address what responsibilities the *Stowers* duty imposes when two or more insurance companies, excess insurers, or reinsurers must jointly fund a settlement.

during which time Dr. Garcia purchased malpractice insurance from the Insurance Corporation of America (ICA) and APIE. The effective date of Dr. Garcia's coverage under APIE's policy was January 8, 1983. On December 23, 1983, the attorney for Cardenas sent Dr. Garcia a letter asserting: "This claim arises out of the treatment of Mr. Cardenas from September 1980 to the present time and the treatment of Mr. Cardenas with the drugs Haldol and Navane during that time period." On December 29, 1983, Dr. Garcia contacted APIE concerning the letter from Cardenas' attorney. At that time, APIE was notified or became aware that Mr. Cardenas had been treated by Dr. Garcia on January 18, 1983, which was within APIE's coverage period. In fact, a representative of APIE affirmatively stated to Dr. Garcia on January 3, 1984 that he had coverage for the treatment of Mr. Cardenas on January 18, 1983:

> Notified Dr. Garcia of his limited coverage with APIE for this incident. He took out his API[E] policy on 1-8-83. The incident in question began in September 1980. Dr. Garcia last treated the pt. in his office on 1-18-93—API[E] would cover this last visit, but it appears Dr. Garcia's previous insurance carrier has the lion's share in this incident.

The medical malpractice suit was filed by Cardenas against Dr. Garcia in early March 1984. The plaintiffs' original petition did not allege any treatment which occurred during APIE's coverage period. Ross Crossland, who had been retained by ICA, filed an answer on behalf of ICA. Although Mr. Crossland was retained by ICA, APIE and ICA agreed to share the costs of defending Dr. Garcia as indicated in the following letter from APIE to ICA:

> This will follow our telephone conversation of March 16, 1984 on the captioned case. I am attaching a copy of our coverage daily

which indicates coverage in the amount of $500,000.00 each claim and $1,000,000.00 annual aggregate. It is my understanding that we agree to share any settlement or judgment on a pro rata coverage basis. We will share the legal expenses on a 50/50 basis. It is my further understanding that [Ross Crossland's firm] ... will be filing an Answer on behalf of Dr. Garcia.[1]

Dr. Garcia was sent a copy of this letter. Also in March 1984, APIE retained its own independent attorneys to monitor the developments in the lawsuit in order to keep APIE advised about significant developments. Between June and October 1984, APIE's file contains the following statements by Dr. Jack Chandler, a physician who was chairman of APIE's board at that time:

> This case will be a tough case to defend. Both Mittler and Garcia are responsible for continuing Haldol. Hard to tell when symptoms of Tardive dyskinesia developed but surely if either doctor had thought of the diagnosis, they would have stopped the drug.

> *    *    *    *    *    *

> Apparently Cardenas was treated with the drug [Haldol] continuously until January 18, 1983.... It will be very difficult to imagine Doctors Garcia and Mittler not having to pay something on this case.

Plaintiff's first amended original petition filed in January 1985 did not allege any treatment which occurred during APIE's coverage period.

In April 1985, APIE informed Dr. Garcia that plaintiff's first amended original petition included a request for an award of punitive damages and that punitive damages were not covered in his policy. APIE further informed Dr. Garcia that plaintiff requested an award of $2,270,000 in damages which exceeded his policy limits of $500,000 and that

---

1. A letter from ICA to APIE also reflected the agreement and stated: "This will confirm our agreement that we will divide the costs of defense in this action equally, and will share any judgment rendered porportionately [sic] to our coverage." Obviously, contrary to the court's assertion, the language of the agreement in no way evidences an assignment of control over the defense from APIE to ICA.

he could be personally liable for any damages of more than $500,000. Plaintiff's second and third amended original petitions filed in May 1985 did not allege any treatment which occurred during APIE's coverage period. On June 6, 1985, Mr. Crossland, who represented Dr. Garcia on behalf of ICA and APIE, wrote Mr. Clem Lyons, whom Dr. Garcia had retained at his own expense, informing him as follows:

> Our client Dr. Ramon Garcia has coverage from two separate insurance companies that might be applicable to this claim. The policy with Insurance Company of America has a single claim limit of $100,000. The policy with API[E] from Dallas is a $500,000.00 limit. I have been advised by those companies that due to the inability to establish an "date of occurrence" with regard to this claim, an arrangement has been made to share the risk.
>
> In essence the two companies will share any settlement or verdict on a pro rata basis up to the total and aggregate limits of the policies of $600,000.00.

A copy of this letter was sent to APIE's own independent attorney. On June 10, 1985, Mr. Crossland wrote a representative of ICA stating that "I have broached settlement with the plaintiff's attorney. He indicates that he will get back to me with a figure in the near future." On July 10, 1985, Mr. Crossland, who represented Dr. Garcia on behalf of ICA and APIE, wrote the plaintiff's attorney, stating

> I have been informed that Dr. Garcia, the defendant in the above styled action, was insured by two different companies during the time frame that could be applicable to this suit. The insurance policy with Insurance Corporation of America had a limit of $100,000.00, as previously indicated in answers to interrogatories.
>
> The second policy of insurance was with API[E], with headquarters in Dallas. The policy limits for that policy were $500,000.00.
>
> I have been informed by both companies that due to the difficulty in ascertaining a

date of loss for evaluation purposes, (the liability for which is still herein denied) the companies have elected to pro rate any settlement or adverse jury verdict on an equal basis.

> My understanding of this arrangement between the two companies is that the total insurance available for settlement or satisfaction of any adverse judgment is therefore $600,000.00.

On July 15, 1985, Cardenas' attorney made a settlement demand of $600,000.00 upon Mr. Crossland. Apparently no response was made to the settlement demand. In fact, the record indicates that APIE never even considered settling the case.

## II.

Plaintiff's fourth amended original petition filed on July 22, 1985 did not allege any treatment which occurred during APIE's coverage period. Plaintiff's fifth amended original petition filed on July 23, 1985 did not allege any treatment which occurred during APIE's coverage period. On July 24, 1985, five days before trial, APIE notified Dr. Garcia that there was no coverage under his policy, stating

> We have just been advised of the most recent Ammended [sic] Petition in the above captioned lawsuit.
>
> The allegations against you arise from treatment rendered to the plaintiff during the period of October 3, 1980 through April 14, 1982, when the plaintiff was treated by Dr. Fernandez. There have been no allegations for the treatment rendered during the office visit with you on January 18, 1983.
>
> \*     \*     \*     \*     \*     \*
>
> As the allegations against you stem from treatment rendered prior to the inception of your policy with American Physicians Insurance Exchange (January 8, 1983) there is no coverage under this policy for this claim.
>
> Early in the investigation of this lawsuit, you received a letter from Ms. Creighton

of our office in which she advised Mr. Kambic of ICA of the policy dates and coverage of your policy with American Physicians. She agreed to pay any settlement or judgment on a pro rata coverage basis, and in an effort to determine if our coverage was applicable, she agreed to share the cost of defense with ICA to eliminate duplicity of legal work. Through this discovery, we have now reached the point where all allegations made against you occurred prior to your coverage with American Physicians. Therefore, there is no coverage afforded under your policy.

By copy of this letter, we are advising Mr. Lyons, Mr. Crossland and Mr. Pressley of ICA to continue providing you with coverage and a defense in this matter.

In addition, on July 24, 1985, APIE's independent attorney notified Mr. Crossland that

> This will also confirm my discussions with you on July 24, 1985, wherein I informed you that APIE believes that no coverage exists under the policy held by APIE for this claim. Therefore, you are incorrect in your previous assertions and understanding that an additional $500,000.00 of coverage existed. As you know, the policy of APIE covered act, errors or omissions made by Dr. Garcia during the policy period. The inception date of the policy of APIE was January 8, 1983. All of the Plaintiff's allegations which have been made in the most recent petitions relate to acts and/or omissions allegedly made during 1980, 1981 and through the date of 1982. Therefore, there would be no allegations relating to any conduct of Dr. Garcia while insured by APIE. Any previous arrangement concerning statements about possible sharing on a pro rata basis in any settlement or judgment was dependent on the finding of actual coverage for the allegations which were being made by the Plaintiff during the pendency of this lawsuit. Since no such allegations relate to any act and/or omission occurring during the APIE policy period, there is no coverage afforded to Dr. Garcia for this lawsuit.

Also on July 24, 1985, Mr. Crossland notified Dr. Garcia that "[i]t is my understanding that as of the denial of coverage by APIE, I am no longer in any manner representing their interest." After July 24, things began to happen at a rapid pace. On July 26, 1985, Cardenas' attorney discovered that there were not one but two ICA policies with coverage of $100,000.00 and $500,000.00 and increased its settlement demand to $1,100,000. Later that same day, Mr. Crossland informed Cardenas' attorney that there were not two but three ICA policies with coverage of $100,000.00, $500,000.00 and $500,000.00:

> Apparently confusion has arisen with regard to the extent of the liability insurance available in conjunction with this case. I have made further inquiry to ICA, and by way of information to you, response to your letter of July 26, and by way of further supplementation to Answers to Interrogatories, I would like to indicate the following: For the period January 8, 1980 through January 7, 1981, Dr. Garcia was covered by ICA Insurance Policy No. P332080 in the amount of $100,000.00. For the period January 8, 1981 through January 7, 1982, Dr. Garcia was covered by ICA Insurance Policy No. P332081 in the amount of $500,000.00. For the period January 8, 1982 through January 7, 1983, Dr. Garcia was covered by ICA Insurance Policy No. P332082 in the amount of $500,000.00.
>
> Although I have been advised by representatives of APIE that I do not in any manner represent their interests, based upon information and belief, I believe that for the period January 8, 1983 through January 7, 1984, Dr. Garcia was covered by an insurance policy with that company in the amount of $500,000.00.
>
> It is my understanding that these policies cannot be totaled or aggregated in any manner to establish coverage in an amount in excess of $500,000.00. To the contrary, it is my present belief that in the event that the jury should find any liability against Dr. Garcia, that it will be necessary to have a further finding as to the date of injury to determine the appropriate policy and limits involved.

I regret any confusion that may have arisen with regard to my previous statements concerning a $100,000.00 policy. At the time of the filing of this law suit, the company [ICA] believed that the allegations arose from treatment commencing in September of 1980. As such, the company understood that the $100,000.00 policy would be applicable to this claim. Again, I regret any confusion that may have arisen from this assessment.[2]

On July 29, 1985, Cardenas' attorney increased its settlement demand to $1,600,000. Apparently no response was made to either settlement demand. Also on July 29, 1985, Cardenas filed his sixth amended original petition which alleged treatment occurring during APIE's coverage period.

After Cardenas amended his pleadings to allege acts of negligence during APIE's policy terms, APIE's independent attorney verbally informed Mr. Crossland that "you're back on the API[E] payroll because they'll [APIE?] have an obligation to defend now" but neither APIE nor its independent attorney informed Dr. Garcia that his coverage had been "reinstated." Also on July 29, 1985, Cardenas executed a covenant not to execute against Dr. Garcia in exchange for an assignment of all of his claims against APIE and ICA.[3] At the medical malpractice trial, Dr. Garcia was defended by Mr. Lyons

2. However, contrary to the court's assertions, Mr. Crossland's July 26, 1985 letter did not represent APIE's position concerning policy limits, settlement authority or anything else because, among other reasons, Mr. Crossland no longer represented the interests of APIE and was no longer defending Dr. Garcia on behalf of APIE. On July 24, 1985, Mr. Crossland notified Dr. Garcia that "[i]t is my understanding that as of the denial of coverage by APIE, I am no longer in any manner representing their interest." Furthermore, Mr. Crossland did not write his July 26, 1985 letter after seeking settlement authority from APIE.

3. The covenant not to execute and the assignment of Dr. Garcia's claims against APIE and ICA were included in one document entitled "Assignment of Interest in Cause of Action and Agreement Designating Assets Subject to Execution." Among other things, the "document" stated:

ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS and LAW OFFICES OF PAT MALONEY, P.C. hereby agree and covenant that should judgment against DR. RAYMOND A. GARCIA be obtained in the above-referenced cause, they shall not levy or issue execution, garnishment or any other process, including abstract of judgment against any assets, or property, of any kind or description, of DR. RAYMOND A. GARCIA with the sole exception of the liability insurance policy or policies which the Defendant, DR. RAYMOND A. GARCIA, as insured thereunder may have with ICA and/or API[E].

\*    \*    \*    \*    \*    \*

It is further agreed that ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS, will indemnify DR. RAYMOND A. GARCIA to the extent of any amount of judgment which might be

rendered in favor of ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS against DR. RAYMOND A. GARCIA in excess of what is actually collected from the insurance carrier.

\*    \*    \*    \*    \*    \*

Plaintiff, ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS, further agrees to indemnify and hold harmless DR. RAYMOND A. GARCIA, his heirs and executors, and assigns and any and all other persons, firms, professional associations or corporations in privity with him against any and all future claims or damages, costs and expenses arising out of the treatment of DR. RAYMOND A. GARCIA provided GUSTAVO CARDENAS during the years Mr. Cardenas was under his professional care.

For and in consideration of the foregoing promise to look only to the proceeds of the liability policies described above in satisfaction of any judgment these Plaintiffs may be entitled to against DR. RAYMOND A. GARCIA, DR. RAYMOND A. GARCIA sells, assigns, transfers, sets over and delivers to ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS and LAW OFFICES OF PAT MALONEY, P.C., their executors, administrators, and assigns, for their use and benefit, any and all sum or sums of money now due or owing DR. RAYMOND A. GARCIA, and all claims, demands, and causes of action of whatsoever kind and nature, which Defendant, DR. RAYMOND A. GARCIA, has had or now has, or may have against Defense Attorneys or ICA or API[E], or any other person or persons, and each and any of them, whether jointly or severally, arising out of, or for any loss, injury or damage sustained by him, or cause or causes of action arising, growing out of, or relating to, or connected with the handling of the claims of ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS against DR. RAYMOND A. GARCIA.

and by Mr. Crossland. On July 29, 1985, the parties agreed to waive a jury and try the case before the court. Throughout the bench trial, APIE's independent attorney was present in the courtroom but did not participate in the trial. Apparently immediately before final argument, Mr. Crossland, on behalf of ICA, offered Cardenas $100,000 to settle the case. The offer was rejected. On August 2, 1985, the trial court awarded Cardenas $2,235,000 on the malpractice claim against Dr. Garcia.

## III.

On August 8, 1985, Dr. Garcia [4] filed suit against ICA and APIE alleging negligence in handling his claim and defending him in the medical malpractice suit. In November 1985, the trial court filed its findings of fact and conclusions of law in the malpractice suit. Among other things, the trial court found that Dr. Garcia "committed continuing acts of negligence in his treatment and care of Gustavo Cardenas from September 19, 1980 to February 1983." The judgment against Dr. Garcia was appealed by ICA on behalf of Dr. Garcia. Apparently APIE was no longer participating—either directly or indirectly—in Dr. Garcia's defense. In May 1986, Dr. Garcia and ICA settled the malpractice and "bad faith" suits for $2,000,000. The appeal of the malpractice suit was dismissed on joint motion of the parties. Subsequently APIE sought to appeal the malpractice judgment by writ of error in the

court of appeals. However, the court of appeals refused to allow it to appeal the malpractice judgment. *See APIE v. Cardenas,* 717 S.W.2d 707, 709 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) ("We conclude that APIE, having rejected its right to participate in the trial court, waived the right to challenge the judgment in *Cardenas v. Garcia* by writ of error."). In May 1987, Dr. Garcia and APIE agreed to a $500,000 payment in exchange for Dr. Garcia's agreement not to contest APIE's motion for a six-month continuance, an offset of the $500,000 payment against any future judgment and a total liability cap of $2.5 million. Along the way, Dr. Garcia amended his pleadings to include negligence, breach of the insurance contracts, violations of the DTPA (false, misleading and deceptive acts, unfair practices in the business of insurance and an unconscionable course of action), violations of articles 21.21 and 21.21–2 of the Insurance Code (including the rules and regulations of the State Board of Insurance made applicable by or issued under article 21.21), and bad faith.[5] During the trial of the "bad faith" suit against APIE in November 1987, the "Assignment of Interest in Cause of Action and Agreement Designating Assets Subject to Execution"—the covenant not to execute—was admitted into evidence. The case was submitted to the jury on negligence, gross negligence, DTPA and Insurance Code violations (including false, misleading and deceptive acts or practices, unfair practices in the business of insurance and an unconscionable course of ac-

---

**4.** The suit was filed by Cardenas as Dr. Garcia's assignees.

**5.** In his seventh amended original petition, Dr. Garcia alleged, among other things, that APIE was liable in the following particulars:

(1) In failing to bargain, negotiate and settle the case within the applicable policy limits;
(2) In failing to advise DR. GARCIA of the potential of an excess judgment and exposure beyond the limits of the policy;
(3) In failing to advise DR. GARCIA of settlement offers made and the effect on him if the offers were not accepted;
(4) In failing to act in good faith to bargain, negotiate and effectuate a settlement;
(5) In withdrawing coverage to DR. GARCIA and failing to provide him with a defense;

(6) In breaching their contract of insurance to provide him coverage under the policy and provide a defense;
(7) In breaching their fiduciary duty to act in good faith and provide coverage under the policy and a defense to DR. GARCIA;
(8) In not providing coverage and a defense after Plaintiff Cardenas' petition was amended;
(9) In failing to carry on negotiations to settle;
(10) In failing to investigate the facts of the case filed by Cardenas to determine that coverage under the policy existed;
(11) In failing to tender the $500,000.00 as provided in the policy of insurance to Plaintiff to be applied toward the judgment and continuing to refuse to pay under the policy of insurance; and
(12) In abandoning the defense of DR. GARCIA prior to the trial of the case against him.

tion). The jury found that (1) APIE negligently failed to settle Dr. Garcia's case prior to September 30, 1985, (2) Cardenas' sixth amended petition alleged separate and distinct acts of negligence committed by Dr. Garcia during APIE's policy period, (3) APIE denied coverage to Dr. Garcia, (4) APIE failed to defend Dr. Garcia at the trial of the Cardenas case, and (5) APIE's actions in failing to defend and provide coverage were false, misleading, or deceptive acts or practices. The jury further found that each of these acts was negligent, in heedless and reckless disregard of Dr. Garcia's rights, an unfair practice in the insurance business, an unconscionable action or course of action, a proximate cause of Dr. Garcia's damages, and done knowingly. The jury awarded Dr. Garcia $2,235,000 in damages, apportioning 84 percent of the liability to ICA and 16 percent to APIE. Dr. Garcia elected to recover under article 21.21. The trial court rendered judgment for Dr. Garcia in the amount of $1,331,574.00 plus post-judgment interest. Among other things, the court of appeals modified the trial court's judgment to increase the amount of the judgment for Dr. Garcia and otherwise affirmed the trial court's judgment.

### IV.

After the malpractice suit was filed in March 1984, APIE sat back for almost sixteen months providing Dr. Garcia with unconditional coverage under his policy. In fact, a representative of APIE affirmatively stated to Dr. Garcia on January 3, 1984 that he had coverage for the treatment of Mr. Cardenas on January 18, 1983. However, on July 24, 1985, five days before the malpractice trial, APIE unexpectedly and without notice informed Dr. Garcia that "there is no coverage under this policy for this claim." The duty of an insurer concerning coverage has been described as follows:

> When an insurer first receives notice of a claim or suit against its insured, the insurer must promptly take one of the following actions:
> (i) acknowledge receipt of the notice and advise the insured that it will provide coverage;

> (ii) advise the insured that it will defend the insured subject to a reservation of its right to deny coverage on one or more specified grounds;

> (iii) deny coverage on the grounds that the claim is either not covered under the policy or that the insured has breached a policy condition; or

> (iv) rescind the policy if it appears that the policy was procured through fraud, mutual mistake of fact, or the insured's misrepresentation or concealment of material facts in the application.

BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 2.01 at 38 (6th ed. 1993). However, it is undisputed that APIE failed to perform any of these duties concerning coverage.

During the sixteen month period, the record indicates that APIE totally failed to take any action to determine whether Dr. Garcia had coverage under his policy. There was no investigation of the facts or allegations concerning coverage. There was no reservation of rights letter or non-waiver agreement. APIE never sought an independent coverage opinion. APIE's explanation for denying coverage on July 24, 1985 was that Plaintiff's fifth amended original petition filed on July 23, 1985 did not allege any treatment which occurred during APIE's coverage period. However, beginning with the plaintiff's original petition filed in March 1984 and continuing with plaintiff's first amended original petition filed in January 1985, plaintiff's second and third amended original petitions filed in May 1985, plaintiff's fourth amended original petition filed on July 22, 1985 and ending with plaintiff's fifth amended original petition filed on July 23, 1985, Cardenas did not allege any treatment which occurred during APIE's coverage period. APIE knew as much about the allegations in the pleadings in March 1984 as it did on July 24, 1985. Furthermore, in April 1985, APIE informed Dr. Garcia that plaintiff's first amended original petition included a request for an award of punitive damages and that punitive dam-

ages were not covered in his policy. APIE also informed Dr. Garcia that plaintiff requested an award of $2,270,000 in damages which exceeded his policy limits of $500,000 and that he could be personally liable for any damages of more than $500,000. However, APIE gave Dr. Garcia every indication that he had unconditional coverage under his policy for sixteen months and then unexpectedly "withdrew" his coverage five days before trial. In fact, APIE's vice-president of claims admitted at trial that the allegations in the pleadings were the only factor considered in denying coverage on July 24, 1985. I find this treatment of Dr. Garcia and APIE's handling of Dr. Garcia's coverage under his policy reprehensible; however, apparently the court approves of APIE's handling of Dr. Garcia's coverage under his policy.

Furthermore, the court asserts that Dr. Garcia may not assert that APIE was estopped to deny that Dr. Garcia had coverage under his policy because he did not request that this issue be included in the court's charge. APIE further asserts that the issue was not conclusively established because "APIE notified [Dr.] Garcia on January 3, 1984, that his coverage under the APIE policy was limited because only one office visit occurred during the APIE policy period." APIE mistakenly equates APIE's following statement to Dr. Garcia on January 3, 1984 as "limiting his coverage:"

> Notified Dr. Garcia of his limited coverage with APIE for this incident. He took out his API[E] policy on 1–8–83. The incident in question began in September 1980. Dr. Garcia last treated the pt. in his office on 1–18–93—API[E] would cover this last visit, but it appears Dr. Garcia's previous insurance carrier has the lion's share in this incident.

Apparently the court mistakenly believes that notification of Dr. Garcia's "limited coverage with APIE for this incident" was the legal equivalent of a reservation of rights. However, it is undisputed that between Janu-

ary 8, 1983 and January 7, 1984, Dr. Garcia was covered by an APIE insurance policy in the amount of $500,000.00, that Dr. Garcia treated Mr. Cardenas in his office during the policy period on January 18, 1983 and that the January 18, 1983 visit was covered under the APIE policy. In fact, the allegations in the pleadings—which did not allege any treatment which occurred during APIE's coverage period—were the only factor APIE considered in denying coverage on July 24, 1985. Contrary to the court's assertion, Dr. Garcia's coverage under his APIE policy was conclusively established.

### V.

Under the *Stowers*[6] doctrine, an insurer owes to its insured the duty to exercise reasonable care in determining whether to settle a claim against the insured within the policy limits. In *Ranger County Mutual Insurance v. Guin*, 723 S.W.2d 656 (Tex.1987), this court expanded an insurer's obligation to include a duty to the insured of investigation, preparation for defense, and trial of the case, as well as reasonable attempts to settle:

> An insurer's duty to its insured is not limited to the narrow boundaries contended by Ranger [that a "Stower's Doctrine" case can be based only upon an insurer's failure to settle a claim against the insured when the claimant offers to settle within the policy limits], rather it extends to the full range of the agency relationship. In this case, that includes investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle.

\* \* \* \* \* \*

Ranger contends that at most it merely breached its contract and there is no basis for an award of exemplary damages. A negligent breach of an agency relationship constitutes an independent tort for which an action for damages will lie. This point of law has been well-settled since this Court's holding in *Williams v. O'Daniels*, 35 Tex. 542 (1871).

---

6. *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

*Id.* at 659–60;[7] *see American Centennial Ins. v. Canal Ins.,* 843 S.W.2d 480, 482 (Tex.1992) ("The insurer's duty to act as an ordinarily prudent person in business management extends to claims investigation, trial defense and settlement negotiations."); *American Centennial Ins.,* 843 S.W.2d at 485 (Hecht, J., concurring, joined by Phillips, C.J., Gonzalez, Cook and Cornyn, JJ.) (Under *Stowers* and *Ranger,* an excess insurance carrier "is equitably subrogated to its insured's rights against a primary insurance carrier ... for negligently investigating, preparing to defend, trying or settling ... [a] third party action."). Even the dissent in *Ranger County Mutual Insurance v. Guin* recognized an insurer's duty to enter into reasonable settlement negotiations:

> Insurance companies in Texas have a duty to exercise ordinary care in defending lawsuits against insureds. This duty includes the duty to enter into reasonable settlement negotiations or to accept a reasonable settlement offer. This doctrine is utilized to protect an insured from a judgment in excess of policy limits.

*Ranger,* 723 S.W.2d at 661 (Gonzalez, J., dissenting). Consequently, this court has expanded an insurer's duties to include acting as an ordinarily prudent person in business management—whether under the *Stowers* doctrine or not—to include making reasonable attempts to settle. This could include the duty to make a good faith effort to evaluate the settlement value of a case, to investigate and explore settlement possibilities, to discuss settlement with the opposing party and to enter into reasonable settlement negotiations. In contrast, an insurer's duty to act as an ordinarily prudent person in business management to make reasonable attempts to settle does *not* require that an insurer (1) settle for more than its policy limits, (2) accept a settlement demand in excess of its policy limits, (3) bid against itself, (4) make the first settlement offer to the opposing party, or (5) make unilateral settlement offers.[8] In addition, under *Ranger County Mutual Insurance v. Guin,* a formal settlement demand within policy limits is no longer an absolute prerequisite to trigger an insurer's duty to make reasonable attempts to settle. Essentially an insurer must do something to facilitate reasonable attempts to settle and may not sit back and do absolutely nothing.

Other jurisdictions have recognized several variations of an insurer's duty to make reasonable attempts to settle. *See* Kent Syverud, *The Duty to Settle,* 76 VA.L.REV. 1113, 1166–67 (1990). In *Rova Farms Resort, Inc. v. Investors Insurance Co. of America,* 65 N.J. 474, 323 A.2d 495 (1974), the New Jersey Supreme Court recognized that an insurer has an affirmative duty to explore settlement possibilities:

> "[a] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company." [quoting *Bowers v. Camden Fire Ins. Association,* 51 N.J. 62, 237 A.2d 857, 861 (1968)] This expertise must be applied, in a given case, to a consideration of all the factors bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

\*   \*   \*   \*   \*   \*

---

7. The court has retroactively altered *Ranger County Mutual Insurance v. Guin* so that its holding—that an insurer's duty to its insured includes "investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle"—has been transformed into mere "dictum."

8. Furthermore, the plaintiff is not prohibited from making a settlement demand within policy limits.

The better view is that the insurer has an affirmative duty to explore settlement possibilities.

*Id.* 323 A.2d at 503–05 (citations omitted); *Alt v. American Family Mutual Ins. Co.,* 71 Wis.2d 340, 237 N.W.2d 706, 712–13 (1976); *Maine Bonding v. Centennial Ins. Co.,* 298 Or. 514, 693 P.2d 1296, 1299 (1985) ("In conducting the defense of a claim against an insured, including the investigation, negotiation, and litigation of the claim, the insurer must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim. The insurer is negligent in failing to settle when an opportunity to settle exists, if in choosing not to settle it would be taking an unreasonable risk—that is, a risk that would involve chances of unfavorable results out of reasonable proportion to the chances of favorable results."); *Spray v. Continental Casualty Co.,* 86 Or.App. 156, 739 P.2d 40, 43 (1987); *Powell v. Prudential Property & Casualty Ins. Co.,* 584 So.2d 12, 14 (Fla.Dist.Ct.App. 1991) ("Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has affirmative duty to initiate settlement negotiations."); *Coleman v. Holecek,* 542 F.2d 532, 537 (10th Cir.1976) (Kansas law) ("[T]he duty to settle arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of its insured."); *Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 586 F.Supp. 84, 87 (E.D.Pa.1984) ("The better view, however, is that the insurer has an affirmative duty to explore settlement possibilities."); *Self v. Allstate Ins. Co.,* 345 F.Supp. 191, 196 (M.D.Fla. 1972). *See Fireman's Fund Ins. Co. v. Security Ins. Co.,* 72 N.J. 63, 367 A.2d 864, 867 (1976) ("Security chose to ignore its obligation to make an honest, intelligent and good faith evaluation of the case for settlement purposes and to weigh the probabilities in a fair manner."); *State Automobile Ins. Co. v. Rowland,* 221 Tenn. 421, 427 S.W.2d 30, 33–35 (1968); *Guarantee Abstract & Title v. Interstate Fire & Casualty Co.,* 228 Kan. 532, 618 P.2d 1195, 1199 (1980); *Bohemia, Inc. v. Home Ins. Co.,* 725 F.2d 506, 511–12

(9th Cir.1984); *Farmers Ins. Exchange v. Schropp,* 222 Kan. 612, 567 P.2d 1359, 1365–66 (1977). *See generally Commercial Union Ins. Co. v. Liberty Mutual Ins. Co.,* 426 Mich. 127, 393 N.W.2d 161, 165–66 (1986).

In *Rova Farms Resort, Inc. v. Investors Insurance Co. of America,* 65 N.J. 474, 323 A.2d 495 (1974), the New Jersey Supreme Court also recognized that a settlement demand within policy limits is no longer an absolute prerequisite:

> [I]t would be unrealistic to believe that such an offer is a prerequisite for finding the insurer to have acted other than in good faith. The better view is that the insurer has an affirmative duty to explore settlement possibilities. At worst, the absence of a formal request to settle within the policy is merely one factor to be considered in light of the surrounding circumstances, on the issue of good faith.

*Id.* 323 A.2d at 505 (citations omitted); *Coleman v. Holecek,* 542 F.2d at 537 ("the duty to settle does not hinge on the existence of a settlement offer from the plaintiff"); *Alt v. American Family Mutual Ins. Co.,* 237 N.W.2d at 712–13; *Powell v. Prudential Property & Casualty Ins. Co.,* 584 So.2d at 14 ("The lack of a formal offer to settle does not preclude a finding of bad faith. Although an offer of settlement was once considered a necessary element of a duty to settle ... an offer to settle is not a prerequisite to the imposition of liability for an insurer's bad faith refusal to settle, but is merely one factor to be considered."); *Bohemia, Inc. v. Home Ins. Co.,* 725 F.2d at 512 ("[A] firm settlement offer 'is not a prerequisite to recovery in every case' but is an important factor in determining whether the insurer refused in bad faith to settle a claim within policy limits."). *See Farmers Ins. Exchange v. Schropp,* 567 P.2d at 1365–66; *State Automobile Ins. Co. v. Rowland,* 427 S.W.2d at 33–35. *See also American Home v. Hermann's Warehouse,* 117 N.J. 1, 563 A.2d 444, 446–47 (1989).

## VI.

The court describes an insurer's duty to settle as (1) the duty to accept reasonable

settlement demands within policy limits, (2) the duty to exercise that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business in responding to settlement demands within policy limits, and (3) a duty of ordinary care that includes reasonable attempts to settle within the insured's coverage after they receive a formal settlement demand within policy limits. The court further asserts that an insurer's "*Stowers* duty" is not activated by a settlement demand unless three conditions exist—(1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it. The court seems to be fixated on the requirement of a formal settlement demand within policy limits and is unable to make the conceptual shift from the rigid and formalized *Stowers* requirement of a formal settlement demand within policy limits to the *Ranger* duty to act as an ordinarily prudent person in business management to make reasonable attempts to settle. Under the court's analysis, an insurer has no duty to act as an ordinarily prudent person in business management to make reasonable attempts to settle or even to act in good faith until it receives a formal settlement demand within policy limits from the plaintiff. In other words, an insurer can do exactly what APIE did in this case—since it never received a formal settlement demand within its policy limits, APIE was justified in doing absolutely nothing. APIE never even considered the possibility of settlement either before or after the malpractice trial and never responded to any of Cardenas' settlement demands.

The court attempts to justify APIE's failure to take any action by stating that APIE never had an opportunity to settle for its policy limits—$500,000.00. This is an outra-geous statement! APIE had every opportunity to attempt to settle for $500,000.00, but it never made any attempts to facilitate settlement. APIE never made a good faith effort to evaluate the settlement value of the case, never investigated or explored the possibility of settlement, never discussed settlement with the opposing party and never engaged in reasonable settlement negotiations with the opposing party. The court asserts that APIE never had an opportunity to settle for $500,000.00 because APIE never received a formal settlement demand within policy limits. The court remains fixated on the requirement of a settlement demand within policy limits.

The court asserts that following *Ranger* would shift the burden of making settlement offers to the insurer. The court apparently envisions the settlement process as a rigid and formalized procedure in which the plaintiff has the "legal burden" to make the first settlement demand and the insurer has the "burden" to respond to the settlement demand.[9] However, as any attorney who has ever negotiated and settled a lawsuit knows, the settlement process is not a rigid and formalized procedure. In fact, everyday, plaintiffs, defendants and insurers act to facilitate reasonable attempts to settle—by making a good faith effort to evaluate the settlement value of a case, by investigating and exploring the possibility of settlement, by discussing settlement with the opposing party and by engaging in reasonable settlement negotiations with the opposing party—without the mechanical requirement of a formal settlement demand within policy limits. Furthermore, the court mistakenly and inexplicably seems to believe that requiring an insurer to act as an ordinarily prudent person in business management in making reasonable attempts to settle would require an insurer (1) to make unilateral settlement of-

9. The court also states that "[i]n light of the fact that Maloney was informed of the insurers' position [concerning policy limits]...." However, which "position" concerning policy limits is the court referring to? ICA's $100,000.00 limit and APIE's $500,000.00 limit communicated to Mr. Maloney on July 10, 1985? ICA's two policies with coverage of $100,000.00 and $500,000.00 and APIE's $500,000.00 limit discovered by Mr. Maloney on July 26, 1985? ICA's three policies with coverage of $100,000.00, $500,000.00 and $500,000.00 and APIE's $500,000.00 limit communicated to Mr. Maloney on July 26, 1985?

fers, (2) to offer the policy limits in literally every case in which the potential for an excess judgment exists, (3) to bid against itself in the absence of a commitment by the claimant that the case can be settled within policy limits, and (4) to make the first settlement offer to the opposing party. The court also mistakenly and inexplicably seems to believe that the plaintiff is prohibited from making a settlement demand within policy limits. In addition, the court asserts that requiring an insurer to act as an ordinarily prudent person in business management in making reasonable attempts to settle would reduce the incentive to negotiate a settlement and encourage early settlement. In fact, requiring insurers to act to facilitate reasonable attempts to settle will encourage early settlements and reduce litigation and settlement costs which will benefit plaintiffs, insureds, insurers, purchasers of liability insurance and taxpayers who subsidize much of the cost of the civil justice system.

Furthermore, the court has mischaracterized this case as solely a *Stowers* case. Although the parties and the court of appeals use that terminology, this case is not a suit brought solely under the *Stowers* doctrine. Dr. Garcia alleged negligence in handling his claim and defending him in the medical malpractice suit, breach of the insurance contracts, violations of the DTPA (false, misleading and deceptive acts, unfair practices in the business of insurance and an unconscionable course of action), violations of articles 21.21 and 21.21–2 of the Insurance Code (including the rules and regulations of the State Board of Insurance made applicable by or issued under article 21.21), and bad faith. The case was submitted to the jury on negligence, gross negligence, DTPA and Insurance Code violations (including false, misleading and deceptive acts or practices, unfair practices in the business of insurance and an unconscionable course of action). Dr. Garcia elected to recover under article 21.21. Obviously this case is not a suit brought solely under the *Stowers* doctrine.

## VII.

APIE contends that it had no responsibility for coverage—and thus no duty to settle—

until July 29, 1985, when plaintiffs filed the sixth amended petition alleging for the first time acts of malpractice within APIE's policy period. Since the covenant not to execute was signed and the trial commenced the same day, APIE contends that it could not have breached any duty to settle the case. I disagree.

First, I believe that APIE created a duty to settle prior to July 29—when none otherwise would have existed—by providing Dr. Garcia with unconditional coverage under his policy for sixteen months from March 1984 until July 24, 1985, by totally failing to take any action to determine whether Dr. Garcia had coverage under his policy, and by actually assuming control of the defense with ICA. APIE admits that after suit was filed in March 1984, APIE and ICA entered into a letter agreement agreeing to divide costs of defense and any settlement or verdict on a pro rata basis. It did not expressly disavow coverage until July 24, five days before trial. In fact, in its application for writ of error, APIE admitted that

> the evidence showed that APIE had provided defense and coverage to Dr. Garcia prior to the filing of the Fifth Amended Petition. During the one-week period between the Fifth and Sixth Amended Petitions, Dr. Garcia assigned his interest in the policy. This assignment terminated any further obligation on the part of APIE to protect Dr. Garcia from an "excess" policy that could not take place. Nonetheless, APIE did continue to provide a defense and coverage to Dr. Garcia and continued to pay defense costs. Evidence of any actions prior to the Sixth Amended Petition, however, is irrelevant and had no probative value since there was no duty to provide coverage until the Sixth Amended Petition was filed. The undisputed evidence discloses that APIE did provide coverage and a defense after the filing of the Sixth Amended Petition.

APIE further stated in its application for writ of error that "[statements of its attorney] clearly established that APIE *had resumed its coverage* and did provide a de-

fense." (Emphasis added). Apparently APIE's position is that it provided coverage to Dr. Garcia before the filing of the sixth amended petition but since it was not legally obligated to provide coverage, it had no duty to attempt to settle.

There is evidence that plaintiffs offered to settle the case for the total amount of coverage represented by Mr. Crossland to be available, which included APIE's policy limits. APIE's involvement raised the stakes of any potential settlement, creating a duty to settle as if it were responsible for coverage. *See Ranger Ins. Co. v. Robertson,* 707 S.W.2d 135, 142 (Tex.App.—Austin 1986, writ ref'd n.r.e.) (insurer was estopped to deny coverage after undertaking the defense unconditionally for a period of seven months). Furthermore, APIE clearly had a duty to pursue reasonable settlement efforts after plaintiffs filed their sixth amended petition, but it made no settlement attempts and, in fact, APIE never considered the possibility of settlement. There is no logical reason why Dr. Garcia's assignment of his tort claims should terminate this duty. On July 29, 1985, the parties agreed to waive a jury and try the case before the court. Although APIE's independent attorney believed that as soon as the jury was waived, a finding of liability was a foregone conclusion and that ICA should settle, neither the independent attorney nor APIE ever considered the possibility of settlement. Apparently APIE was confident that no negligence or causation would be found against Dr. Garcia during APIE's coverage period. In addition, on July 31, 1985, the trial judge called the attorneys into chambers and told them that he wanted the case settled because he was afraid that he might find punitive damages against Dr. Garcia. The attorneys reported that Cardenas was demanding $1,600,000.00 and ICA and APIE were offering $0. The trial judge was furious and told the attorneys to talk to their clients and attempt to settle. ICA decided to make no settlement offer. In spite of the trial judge's comments, the record indicates that neither the independent attorney nor APIE ever considered the possibility of settlement and never responded to any of Cardenas' settlement demands. In fact, the record indicates that neither the independent attorney nor APIE ever considered the possibility of settlement either before or after the malpractice trial. Furthermore, there is at least some evidence of APIE's failure to attempt reasonable settlement efforts after the filing of the sixth amended petition during the malpractice trial. The assignment between Dr. Garcia and the Cardenas did not terminate APIE's duty to Dr. Garcia arising under the policy, and thus did not terminate the opportunity to breach that duty. Moreover, regardless of when the bad faith occurs, the damages from the bad faith—the excess judgment against the insured—will typically not accrue in cases such as this until after the assignment and release.

APIE argues that it could not have settled the case *independently* of ICA; that is, plaintiffs at all times demanded the combined policy limits of the two insurers. There is no evidence, however, that APIE ever offered its individual policy limits. In addition, two insurers jointly responsible for coverage should not be allowed to avoid their duty to make reasonable attempts to settle by arguing that neither could have independently settled the case within their individual policy limits. APIE's argument is particularly unpersuasive since it agreed with ICA to divide costs of any settlement on a pro rata basis.

### VIII.

The next issue, which was considered in our December 31, 1992 opinion, concerns whether an injured plaintiff, as the assignee of the insured, is precluded from recovering damages from the insurer by the existence of a covenant between the plaintiff and the insured to seek relief only from the insurer.

Insurance companies will at times inappropriately refuse to settle a case, thereby exposing their insureds to liability in excess of policy limits. *See* Kent Syverud, *The Duty to Settle,* 76 VA.L.REV. 1113, 1120 n. 15 & 1126 (1990). *See also* Bob Roberts, *Agreements Between Claimants and Insureds After Misconduct By Insurers,* STATE BAR

OF TEXAS—SUING, DEFENDING AND NEGOTIATING WITH INSURANCE COMPANIES B–24–26 (1991) (hereinafter Roberts). To remedy this problem, many states, including Texas, allow an insured to assign any claim against the insurer in exchange for a covenant not to execute. *See Foremost County Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 759–60 (5th Cir. 1990); *Young Men's Christian Ass'n (YMCA) v. Standard Ins. Co.*, 552 S.W.2d 497, 504–05 (Tex.Civ.App.—Fort Worth 1977), *writ ref'd n.r.e. per curiam*, 563 S.W.2d 246 (Tex.1978); Reagan M. Brown, *Defending Against the Sweetheart Deal*, STATE BAR OF TEXAS—SUING, DEFENDING AND NEGOTIATING WITH INSURANCE COMPANIES I–18 (1991) (hereinafter Brown); *Ranger v. Superior Coach Sales and Service of Arizona*, 110 Ariz. 188, 516 P.2d 324, 327 (1974); *Ivy v. Pacific Automobile Ins. Co.*, 156 Cal.App.2d 652, 320 P.2d 140, 147 (1958).

The use of a covenant not to execute provides insurers with a strong incentive to give due consideration to the interests of its insureds. *See YMCA*, 552 S.W.2d at 504–05; *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 575–76 (1986). The necessity of such covenants is particularly apparent when an insurer has refused to provide a defense:

> In such a situation, the *YMCA* rule is needed to protect the insured adequately. Where the insurer refuses to tender a defense, the insured often can protect himself only with a covenant not to execute. Without such a covenant, the insured either would have to pay the plaintiffs enough to settle their claim or would have to incur defense costs himself, even though the insurer is contractually responsible for payment of such costs. Were a covenant not to execute to absolve the insurer of liability, plaintiffs would have no incentive to enter into such a covenant.

*Foremost County Mut. Ins. Co.*, 897 F.2d at 759 (citations omitted). Without the availability of such a covenant, there may be nothing to deter an insurer from failing to give due regard to its insured's interests.

*See YMCA*, 552 S.W.2d at 504–05; *Foremost County Mut. Ins. Co.*, 897 F.2d at 760.

## IX.

In *Samson v. Transamerica Insurance Co.*, 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32 (1981), the California Supreme Court allowed the insured to recover the entire amount of the underlying judgment despite the existence of a covenant not to execute. The court stated:

> "[W]here the insurer has repudiated its obligation to defend[,] a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute." (*Zander v. Texaco, Inc.* (1968) 259 Cal.App.2d 793, 802, 66 Cal.Rptr. 561; accord, *Johansen, [v. California State Auto. Ass'n Inter–Insurance Bureau]* supra, 15 Cal.3d 9, 14, fn. 3, 123 Cal.Rptr. 288, 538 P.2d 744; *Comunale, [v. Traders and General Ins. Co.]* supra, 50 Cal.2d 654, 661–662, 328 P.2d 198). When the insurer "exposes its policyholder to the sharp thrust of personal liability" by breaching its obligations, the insured "need not indulge in financial masochism...." (*Critz v. Farmers Ins. Group*, (1963) 230 Cal.App.2d 788, 801, 41 Cal.Rptr. 401).

> \*   \*   \*   \*   \*   \*

> "[B]y executing the assignment, he attempt[ed] only to shield himself from the danger to which the company.... exposed him." (Id. at p. 801, 41 Cal.Rptr. 401). He acted in his own self-interest, after Transamerican's denial of coverage, as he had every right to do. Any resulting damage to Transamerican was not caused by Vagel's supposed misconduct but by Transamerican's own intransigence.

*Id.* 178 Cal.Rptr. at 356, 636 P.2d at 45. Thus, the California Supreme Court imposed liability for the entire amount of the judgment even though the insured had entered into an agreement not to execute.

To hold otherwise would make pretrial covenants not to execute functionally obsolete because

[t]he third-party claimant would have no incentive to agree to any arrangement that would protect the insured's personal assets from execution, for any such agreement would extinguish the insured's potentially most valuable assets, his cause of action against the insurer. Third-party claimants would have no choice but to proceed to judgment against the insured. This would result in a waste of judicial resources for no other purpose than to preserve the inchoate cause of action for failing to settle.

Stephen Ashley, *Garcia v. American Physicians Insurance Exchange: The More the Merrier*, 7 Bad Faith Law Report 157, 162 (Sept.1991).

Another policy behind allowing recovery for the excess judgment despite the existence of a covenant not to execute is deterrence:

> The final important fact which we extract from the cases is that of deterrence. In contractual relationships in which one party primarily has sought protection or security rather than profit or advantage, contract damages not only fail to provide adequate compensation but also fail to provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship. In the first place, they offer no motivation whatsoever for the insurer *not* to breach.

*Rawlings v. Apodaca*, 726 P.2d at 575 (emphasis in original). If there were no recovery for the excess judgment, there would be more of an incentive for breach of the contract than its performance.

Pretrial covenants not to execute should be encouraged as a matter of public policy fa-

voring settlements and minimizing the insured's potential damages. *See Rainbo Baking Co. v. Stafford*, 787 S.W.2d 41, 42 (Tex. 1990). Furthermore, "[p]ublic policy permitting or proscribing tactical weapons developed by claimants and insurers should be shaped by two influences: (1) the public interest in encouraging settlements, and (2) fairness, that is, equalization of the contenders' strategic advantages." *Critz v. Farmers Ins. Group*, 230 Cal.App.2d 788, 801, 41 Cal. Rptr. 401, 408 (1964). When Dr. Garcia assigned his claim against APIE in exchange for a covenant not to execute, he was able to settle his dispute with the Cardenas by turning his insurer's wrongful conduct into a bargaining strength in dealing with the claimant. Public policy considerations are better served by allowing an injured claimant to collect from the party who engaged in false, misleading and deceptive acts and caused those damages—the insurance company—rather than the victim of those acts—the insured.[10]

### X.

We are aware of no Texas case addressing the effect of a pretrial covenant not to execute on damages stemming from the insurer's negligence or bad faith. *Whatley v. City of Dallas*, 758 S.W.2d 301 (Tex.App.—Dallas 1988, writ denied) and *Foremost County Mutual Insurance Co. v. Home Indem. Co.*, 897 F.2d 754 (5th Cir.1990) are not directly applicable—in both cases the courts expressed "no opinion as to whether a judgment creditor may recover against an insurer damages awarded against its insured in excess of policy limits for which the insured is not personally liable *if the insurer has acted negligently*

---

**10.** Although this case is different from many cases involving pretrial covenants not to execute (such as settlement or consent judgments) because the issues in the malpractice case were vigorously contested in an adversary proceeding, we are aware that cases involving pretrial covenants not to execute may not always be energetically contested in an adversary proceeding. Consequently, permitting the insured to "settle" with the injured claimant before trial and sign a covenant not to execute may present a real concern for the insurer. *See United Services Auto.*

*Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246, 252–53 (1987) ("To relieve himself of personal exposure, the insured may be persuaded to enter into almost any type of agreement or stipulation by which the claimant hopes to bind the insurer . . . ."). "The real concern in this type of case is that the settlement [or judgment] between the claimant and the insured may not actually represent an arm's length determination of the worth of the plaintiff's claim." *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla. Dist.Ct.App.1984).

*or in bad faith."* *Whatley,* 758 S.W.2d at 310 n. 6 (emphasis added). *See Foremost County Mut. Ins. Co.,* 897 F.2d at 759 n. 7.

In *Whatley,* based upon the circumstances in that case,[11] the court of appeals characterized the insured's claim that the insurer wrongfully failed to defend him as a breach of the insurer's contractual duty to defend its insured. 758 S.W.2d at 306–07. Subsequently, the court of appeals held that "the [pretrial] covenant not to enforce adjudged damages against the insured does not bar recovery from the insurer within its policy limits." *Id.* at 310. However, "the same rule does not apply to allow recovery against an insurer in excess of policy limits." *Id.* The court stated that "[t]o allow the creditor to release the insured from liability for such excess damages without effecting the release of the insurer would give the creditor and insured the power to unilaterally to extend the insurer's liability." *Id.* Obviously, a pretrial covenant not to execute on a judgment does not give the creditor (or injured claimant) and insured the power to unilaterally extend the insurer's liability. Liability will only be imposed if the jury finds that the insurer acted in bad faith, negligently, or in violation of the DTPA or Insurance Code and the damages[12] were caused by the insurer's wrongful conduct. Furthermore, if the jury determines that no coverage existed, the creditor or injured claimant takes nothing since he has agreed not to execute against the assets of the insured.

Some would argue that a plaintiff's agreement not to execute a judgment against a defendant's personal assets, in exchange for an assignment of defendant's bad faith claims, eliminates any bad faith damages arising from that judgment. I disagree.

A plaintiff's agreement not to execute a judgment against a defendant's personal assets, in exchange for an assignment of defendant's bad faith claims, does not eliminate any bad faith damages arising from that judgment. If a defendant *pays* an excess judgment, thereby obtaining a judgment release, the value of the defendant's bad faith claim against his or her insurer is not diminished. The result should be no different when the defendant obtains relief from the judgment not by paying cash, but by transferring a valuable asset—his or her tort claim. Assume, for example, that Dr. Garcia had assigned his claims against APIE and ICA to a *third party* in exchange for sufficient cash to pay the malpractice judgment

---

11. Apparently the insured never claimed that the insurer acted negligently or in bad faith in failing to defend him in the underlying suit.

12. In this type of case, the insured's damages may include the amount of the underlying judgment and additional damages. For example, a physician suffers significant harm when an insurer's bad faith leads to the entry of an adverse judgment. Amicus Curiae Texas Medical Association asserts that foreseeable harm may include:
    1. The loss of the fair chance to prepare and present a successful defense or reach settlement prior to trial.
    2. Harm resulting from stress caused by the insurer's negligent failure to defend or bad faith failure to settle.
    3. Possible exhaustion of the insured's aggregate professional liability insurance policy limits. If the insured's aggregate policy limits are exhausted under a "claims made" professional liability insurance policy, the physician would be exposing his personal assets and property to satisfy any other adverse judgment or settlement.
    Brief of Amicus Curiae, Texas Medical Association at 8. In addition, the existence of the un-

paid judgment can harm a person's credit, in that:
> [t]he presence of a judgment against the insured will cause him problems in ordinary borrowing. No bank or bank officer can explain to the FDIC that the person to whom it or he wants to loan substantial money is not ever going to have to pay off the judgment. Nor can the insured get most bankers to stand that kind of heat with their loan committees.... If the insured is late as to other obligations, the creditor may even file involuntary bankruptcy proceedings [against the insured] because they count the judgment as a debt.

*See* Roberts at B–26–27. *See also Campbell v. State Farm Mutual Automobile Ins. Co.,* 840 P.2d 130, 139 (Utah App.1992). Harm may arise in other contexts as well. For example, the rendition of a medical malpractice judgment may negatively impact the physician's reputation and the standing in both the medical community and the community at large. In short, an individual still suffers damages and many forms of harm.

to the Cardenases. The fact that Dr. Garcia used that cash to satisfy the judgment should not prejudice the tort claim in the hands of the third party. The result is no different when Dr. Garcia assigns the bad faith claim directly to the Cardenases in exchange for a covenant not to execute, as he did in this case.

## XI.

Many courts permit the use of *pretrial* covenants not to execute.[13] *See Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969); *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163, 174 (1982) (even though the insured executed an assignment and a pretrial covenant not to execute, "a settlement [or agreed judgment] may be enforced against an insurer in this situation ... if it is reasonable in amount and entered in good faith."); *Kagele v. Aetna Life & Cas. Co.,* 40 Wash.App. 194, 698 P.2d 90, 92 (1985); *Greer v. Northwestern Nat'l Ins. Co.,* 109 Wash.2d 191, 743 P.2d 1244, 1251 (1987); *Lancaster v. Royal Ins. Co. of America,* 302 Or. 62, 726 P.2d 371, 374 (1986) ("Whether the assignment was made of a judgment in existence or a judgment to come into existence is not determinative of whether or not the insured's assignee may maintain an action against the insurance company. Rather, the language of the covenant is determinative."); *United Services Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987);

*Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589 (Fla.Dist.Ct.App.1984); *Shook v. Allstate Ins. Co.,* 498 So.2d 498 (Fla.Dist. Ct.App.1986); *Samson v. Transamerica Ins. Co.,* 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32 (1981); *Bishop v. Crowther,* 101 Ill. App.3d 933, 57 Ill.Dec. 341, 428 N.E.2d 1021 (1981); *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982); *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 593 P.2d 948, 953 (App.1979) (A "covenant not to execute is not a release which would permit the insurer to escape its obligations."). *But see Huffman v. Peerless Ins. Co.,* 17 N.C.App. 292, 193 S.E.2d 773, 774, *cert. denied,* 283 N.C. 257, 195 S.E.2d 689 (1973) (Under the terms of the consent judgment and the covenant not to execute, the insureds "were not legally obligated to pay damages to plaintiffs."); *American Casualty Co. v. Griffith,* 107 Ga. App. 224, 129 S.E.2d 549, 552 (1963) ("[T]he principal amount of recovery sought is not recoverable because it is not shown to be an amount which the petitioner is legally obligated to pay, and the promise of the defendant is only to pay such sums as the petitioner would be obligated to pay in damages."); *Freeman v. Schmidt Real Estate & Ins.,* 755 F.2d 135, 138 (8th Cir.1985) ("an insured protected by a covenant not to execute has no compelling obligation to pay any sum to the injured party; thus, the insurance policy imposes no obligation on the insurer."); *Bendall v. White,* 511 F.Supp. 793, 795 (N.D.Ala. 1981).[14]

---

**13.** In addition, the overwhelming majority of courts permit the use of pretrial and/or post-trial covenants not to execute. *See, e.g., Metcalf v. Hartford Acc. & Ind. Co.,* 176 Neb. 468, 126 N.W.2d 471 (1964); *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163, 174 (1982); *American Family Mut. Ins. Co. v. Kivela,* 408 N.E.2d 805 (Ind.App. 1980); *Miller v. Shugart,* 316 N.W.2d 729 (Minn. 1982); *First Nat'l Indem. Co. v. Mercado,* 511 S.W.2d 354 (Tex.Civ.App.—Austin 1974, no writ); *Kagele v. Aetna Life & Cas. Co.,* 40 Wash.App. 194, 698 P.2d 90 (1985); *Crabb v. Nat'l Ind. Co.,* 87 S.D. 222, 205 N.W.2d 633 (1973); *Ammerman v. Farmers Ins. Exch.,* 22 Utah 2d 187, 450 P.2d 460 (1969); *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 593 P.2d 948 (App.1979); *Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589 (Fla.Dist.Ct.App.1984); *Shook v. Allstate Ins. Co.,* 498 So.2d 498 (Fla.Dist.Ct.App. 1986); *Glenn v. Fleming,* 247 Kan. 296, 799 P.2d 79 (1990); *Greer v. Northwestern Nat'l Ins. Co.,* 109 Wash.2d 191, 743 P.2d 1244 (1987); *Lancas-*

*ter v. Royal Ins. Co. of America,* 302 Or. 62, 726 P.2d 371 (1986); *United Services Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987); *Zander v. Casualty Ins. Co.,* 259 Cal.App.2d 793, 66 Cal.Rptr. 561 (1968); *Samson v. Transamerican Ins. Co.,* 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32 (1981); *LaRotunda v. Royal Globe Ins. Co.,* 87 Ill.App.3d 446, 42 Ill.Dec. 219, 408 N.E.2d 928 (1980); *Bishop v. Crowther,* 101 Ill. App.3d 933, 57 Ill.Dec. 341, 428 N.E.2d 1021 (1981); *Coblentz v. American Surety Co.,* 416 F.2d 1059 (5th Cir.1969); *Gray v. Grain Dealers Mut. Ins.,* 871 F.2d 1128, 1133 (D.C.Cir.1989); *Steedly v. London & Lancashire Ins.,* 416 F.2d 259 (6th Cir.1969). *But see Huffman v. Peerless Ins. Co.,* 17 N.C.App. 292, 193 S.E.2d 773, *cert. denied,* 283 N.C. 257, 195 S.E.2d 689 (1973); *American Casualty Co. v. Griffith,* 107 Ga.App. 224, 129 S.E.2d 549 (1963); *Bendall v. White,* 511 F.Supp. 793, 795 (N.D.Ala.1981).

In *Greer v. Northwestern National Insurance Co.*, the Washington Supreme Court stated:

A "slim majority" of jurisdictions permit an injured plaintiff to recover damages from the insurer despite the existence of a covenant between the plaintiff and the insured to seek relief only from the insurer. This majority rule is based on the rationale that when an insurer has refused to defend its insured, it is in no position to argue that the steps the insured took to protect himself should inure to the insurer's benefit.

743 P.2d at 1251 (citations omitted). *Accord Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d at 591 ("[W]e hold that the carrier was not necessarily exonerated because Walker [the insured] was able to obtain his own discharge from liability in the course of reaching an agreement with Steil [the injured claimant]. Clearly, the intent of Steil and Walker was not to release the carrier."); *Shook v. Allstate Ins. Co.*, 498 So.2d at 500; *Miller v. Shugart*, 316 N.W.2d at 732 ("While it is true that defendants need not pay anything, it is also true that the judgment effectively liquidates defendants' personal liability. We hold, therefore, that plaintiff may seek to collect on that judgment in a garnishment proceeding against the insurer."); *Kagele v. Aetna Life & Cas. Co.*, 698 P.2d at 92 (in the context of a covenant not to execute

coupled with an assignment and settlement agreement, an insurer may be liable to an injured claimant even if the insured is not); *Bishop v. Crowther*, 57 Ill.Dec. at 344, 428 N.E.2d at 1024 (quoting *Bishop v. Crowther*, 92 Ill.App.3d 1, 47 Ill.Dec. 594, 600, 415 N.E.2d 599, 605 (1980)) [15] ("The execution determines which of defendant's assets will be used to satisfy the judgment. An agreement limiting execution to specific assets [such as relating to insurance] does not negate damages.").

Based on public policy considerations including the interest of judicial economy, encouraging settlements, providing adequate protection of insureds and providing insurers with a strong incentive to give due consideration to the interests of its insureds, I would hold that an injured plaintiff, as the assignee of the insured, is not precluded from recovering damages from the insurer by the existence of a covenant between the plaintiff and the insured to seek relief only from the insurer.

## XII.

APIE argues that since Dr. Garcia had received $2.5 million in settlements with ICA and APIE, his damages were satisfied. I disagree.

First, APIE erroneously assumes that the settlements should be applied to the underlying judgment rather than as a dollar-for-

---

**14.** Although this case is limited to pretrial covenants not to execute, APIE's arguments—that a pretrial covenant not to execute necessarily negates all damages—would apply equally to posttrial covenants not to execute. In other words, under the reasoning employed by APIE, if Cardenas executed a covenant not to execute against Dr. Garcia in exchange for an assignment of his claims against APIE and ICA after the underlying medical malpractice trial, Dr. Garcia would still not suffer a compensable harm because of the alleged "protective effects" of the covenant not to execute.

**15.** In the appeal of the underlying injury suit, the defendant/insured asserted that there was no proof of damages:

Plaintiff and defendant entered into a covenant providing that plaintiff would not seek to execute any judgment against any personal assets

of defendant, but reserved the right to execute against assets relating to his insurance. Crowther [the defendant/insured] asserts that a legal consequence of this covenant is that no damages are enforceable against him individually. He further maintains that plaintiff failed to establish an element of his cause of action: proof of damages. We disagree. Defendant's argument fails to distinguish between such concepts as liability, damages, judgment and execution. Defendant's liability and the amount of damages were both established by the judgment. The execution determines which of defendant's assets will be used to satisfy the judgment. An agreement limiting execution to specific assets does not negate damages.

*Bishop v. Crowther*, 47 Ill.Dec. at 600, 415 N.E.2d at 605.

dollar credit or pro rata reduction of damages in the bad faith case. Second, Texas has the following four distinct contribution schemes—three based on statute and one created at common law:

1. The original contribution statute (Tex. Civ.Prac. & Rem.Code § 32.001 *et seq.*);

2. The comparative negligence statute (former Tex.Civ.Prac. & Rem.Code § 33.-001 *et seq.*) which applies only in pure negligence cases filed before September 2, 1987;

3. The common law contribution by comparative causation (*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 429 (Tex.1984)) which applies only to products cases involving strict liability, breach of warranty, and mixed theories of strict liability and negligence tried after July 13, 1983; and

4. The comparative responsibility statute (Tex.Civ.Prac. & Rem.Code § 33.001 *et seq.*) which applies to cases filed on or after September 2, 1987.

*Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 5 (Tex.1991).

Dr. Garcia filed suit against ICA and APIE in August 1985 alleging negligence in handling his claim and defending him in the medical malpractice suit. Later, Dr. Garcia amended his pleadings to include allegations of negligence, breach of the insurance contracts, violations of the DTPA (false, misleading and deceptive acts, unfair practices in the business of insurance and an unconscionable course of action), violations of articles 21.21 and 21.21–2 of the Insurance Code (including the rules and regulations of the State Board of Insurance made applicable by or issued

under article 21.21), and bad faith. The case was tried in November 1987 and submitted to the jury on negligence, gross negligence, DTPA and Insurance Code violations (including false, misleading and deceptive acts or practices, unfair practices in the business of insurance and an unconscionable course of action). The jury found that (1) APIE negligently failed to settle Dr. Garcia's case prior to September 30, 1985, (2) Cardenas' sixth amended petition alleged separate and distinct acts of negligence committed by Dr. Garcia during APIE's policy period, (3) APIE denied coverage to Dr. Garcia, (4) APIE failed to defend Dr. Garcia at the trial of the Cardenas case, and (5) APIE's actions in failing to defend and provide coverage were false, misleading, or deceptive acts or practices. The jury further found that each of these acts was negligent, in heedless and reckless disregard of Dr. Garcia's rights, an unfair practice in the insurance business, an unconscionable action or course of action, a proximate cause of Dr. Garcia's damages, and done knowingly. The jury awarded Dr. Garcia $2,235,000 in damages, apportioning 84 percent of the liability to ICA and 16 percent to APIE.[16] Dr. Garcia elected to recover under article 21.21.

As a result, the comparative negligence statute which applies only to pure negligence cases filed before September 2, 1987 (former Tex.Civ.Prac. & Rem.Code § 33.001 *et seq.*), the common law contribution by comparative causation (*Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 429 (Tex.1984)), and the comparative responsibility statute which applies to cases filed after September 2, 1987 (Tex.Civ.Prac. & Rem.Code § 33.001 *et seq.*) do not apply. Consequently, the original contribution statute (Tex.Civ.Prac. & Rem.

16. The jury was asked 2 questions related to "apportionment." Special Issue No. 33 asked:
  What percentage, if any, of the damages found by the Court in Cardenas v. Garcia were proximately caused by the acts or omissions of Dr. Garcia on or after 1/8/83?
  Answer by stating the percentage found.
  We, the Jury, Answer: <u>16%</u>
Special Issue No. 36 asked:
  For each party found by you to have caused damage to Dr. Garcia find the percentage caused by:

| ICA | 84% |
|-----|-----|
| APIE | 16% |
| | 100% |

Apparently, special issue nos. 33 and 36 were submitted by APIE.

Code § 32.001 *et seq.*) applies. *Stewart Title Guaranty Co.,* 822 S.W.2d at 6.

## XIII.

*Bradshaw v. Baylor University,* 126 Tex. 99, 84 S.W.2d 703, 705 (1935) and the "one satisfaction rule" apparently apply in this case. *See Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d at 5–8. Under *Bradshaw v. Baylor University* and the "one satisfaction rule," nonsettling joint tortfeasors are entitled to receive a credit against the judgment based on the settlements reached between the plaintiff and other joint tortfeasors. *Stewart Title Guaranty Co.,* 822 S.W.2d at 8. When the jury has fixed the liability of the nonsettling defendant, the

credit may be determined through either the dollar-for-dollar method or the pro rata reduction method, whichever results in the greatest reduction. *See id.* at 9 n. 10; *Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764, 771–72 (Tex.1964) (citing Gus M. Hodges, *Contribution and Indemnity Among Tortfeasors,* 26 Tex.L.Rev. 150, 170 (1947)). In either case, the credit is applied after the trebling (or doubling) of actual damages under article 21.21 of the Insurance Code, *Stewart Title,* 822 S.W.2d at 8–9, and the percentages of responsibility found by the jury are inapplicable. *See* Tex.Civ.Prac. & Rem.Code § 32.001 *et seq.* (Vernon 1986).

If the dollar-for-dollar credit method is applied, Dr. Garcia's damages would be calculated as follows:

| | | |
|---|---|---|
| Actual Damages | | $2,235,483.30 |
| Additional Damages | | $4,470,966.60 |
|     actual damages | $2,235,483.30 | |
|     ×2 under amended art. 21.21 | ×2 | |
| | $4,470,966.60 | |
| Settlement credit | | −$2,500,000.00 |
|     APIE offset | $500,000.00 | |
|     ICA settlement | $2,000,000.00 | |
| | $2,500,000.00 | |
| Attorney's fees | | $820,500.00 |
| TOTAL | | $5,026,949.90 [17] |
| TOTAL RECOVERY | | $2,000,000.00 |

---

Under the "partial settlement" with APIE, Dr. Garcia and APIE agreed that Dr. Garcia's damages would be limited to $2,000,000.00. Consequently, the total award against APIE using any method of calculating damages would be limited to $2,000,000.00.

Under the pro rata reduction method, the amount of contribution is based solely on the number of defendants found liable for the plaintiff's damages. *See* Tex.Civ.Prac. & Rem.Code § 32.003 (Vernon 1986). The

credit is "determined by dividing the number of all liable defendants into the total amount of the judgment." *Id.* § 32.003(a). In this case, the jury determined that ICA and APIE were liable for Dr. Garcia's damages. Therefore, the pro rata reduction is determined by dividing the total amount of damages by 2 (or multiplying by .5). If the pro rata reduction provided by *Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764 (Tex.1964) is applied, Dr. Garcia's damages would be calculated as follows:

| | | |
|---|---|---|
| Actual Damages | | $2,235,483.30 |
| Additional Damages | | $4,470,966.60 |
|     actual damages | $2,235,483.30 | |
|     × 2 under amended art. 21.21 | ×2 | |
| | $4,470,966.60 | |

17. This figure does not include any amounts which may be recoverable as prejudgment interest. We express no opinion whether prejudgment interest should be considered when determining dollar for dollar credit or pro rata reduction.

| APIE'S pro rata reduction | | −$3,353.224.95 |
|---|---|---|
| Garcia's damages | $6,706,449.90 | |
| Pro rata reduction | ×.50 | |
| | $3,353,224.95 | |
| Attorney's fees | | $820,500.00 |
| TOTAL | | $4,173,724.95 |
| TOTAL RECOVERY | | $2,000,000.00 |

As a result, regardless of which method of calculating damages was used (dollar-for-dollar credit or pro rata reduction), the result was the same—APIE's liability was $2,000,000.

## XIV.

APIE argues that the settlement agreements between (1) Cardenas, Dr. Garcia and ICA for $2,000,000 and (2) Dr. Garcia and APIE for $500,000 should have been admitted into evidence. I disagree.

"The traditional Texas rule is that settlement agreements between the plaintiff and a co-defendant should be excluded from the jury. A contrary rule would frustrate the policy favoring the settlement of lawsuits." *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977); *City of Houston v. Sam P. Wallace and Co.*, 585 S.W.2d 669, 673 (Tex.1979); *McGuire v. Commercial Union Ins. Co.*, 431 S.W.2d 347, 352 (Tex.1968). *See Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex.1986).[18] The settlement agreements in cases such as *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991) and *First Title Company of Waco v. Garrett*, 860 S.W.2d 74 (Tex.1993) were not admitted into evidence for the jury to consider. However, they were considered by the trial court when applying *Bradshaw v. Baylor University* and the "one satisfaction rule."

For the reasons explained herein, I would affirm the judgment of the court of appeals.

---

18. However, "when a settling defendant retained a financial stake in a plaintiff's recovery [such as a Mary Carter agreement], the excluding of evidence of that fact from the jury was harmful error." *Scurlock Oil Co. v. Smithwick*, 724

S.W.2d at 4; *General Motors Corp. v. Simmons*, 558 S.W.2d at 858–59. APIE does not argue that it or ICA retained a "financial stake" in Dr. Garcia's recovery. Consequently, this case is different from a Mary Carter case.